UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 13 CIV 1534

KEREN MATANA, a not-for-profit entity,

Plaintiff,

-against-

J. EZRA MERKIN and GABRIEL CAPITAL
CORPORATION,

Defendants.

Docket No. 13 Civ. _____

JURY TRIAL REQUESTED

RECEIVED
MAR 07 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

COMES NOW plaintiff Keren Matana ("KM"), by its undersigned attorneys, Brickman

Leonard & Bamberger, P.C., and, as and for its Complaint against defendants J. Ezra Merkin

("Merkin") and Gabriel Capital Corporation ("GCC"), alleges, on knowledge as to itself and its

own acts, and on information and belief as to all other matters, as follows:

### Nature of and Need for this Action

1.        By this diversity action, plaintiff, a not-for-profit, purely charitable, entity,

seeks redress for a scheme to defraud, conducted by defendants Merkin and GCC.  Benjamin

Jesselson was, at the time of the subject investments, a member of KM.  GCC, formerly known

as Ariel Management Corporation, was, prior to January 1, 2003, the investment advisor (the

"IA") to non-party Ascot Fund Limited ("Ascot Fund").  At all relevant times, Merkin owned

100% of the capital stock of GCC and exerted absolute control over its business and affairs.

Ascot Fund was an offshore hedge fund offered and supposedly managed by Merkin, acting,

prior to January 1, 2003, through GCC.

2.        In 2002-2004, plaintiff KM invested a total of $1.5 million in shares of Ascot

Fund.  KM made these investments based upon prospectuses issued by Merkin and GCC dated

February 1996 and December 2002; Ascot Fund's long record of consistent, albeit far from spectacular, profitability; Merkin's carefully-cultivated reputation as an especially risk-averse and cautious money manager; the inter-generational friendship and association between the Merkin and Jesselson families; and their joint commitment to Jewish and other philanthropies, in the United States and Israel.

3.     Even though he was not yet even a member of the Board of Trustees at Yeshiva University (YU), in 1993 YU made Merkin chairman of its Investment Committee, responsible, among other things, for oversight of $25 million in new hedge fund investments approved by that committee in late 1992. For that point forward, over a period of 15-16 years, Merkin held himself out as an especially astute, discerning, hands-on and *trustworthy* asset manager, particularly to those in the Modern Orthodox Jewish community, who (to Merkin's actual knowledge) regarded Merkin as "the Rabbi of Wall Street." Above all else, even if his results were not spectacular, they were consistent – and his judgment and probity seemed beyond question.     However, unlike even Madoff -- who for decades ran an entirely legitimate, off-exchange market in major stocks, including NYSE listed stocks, putting vast downward price pressure on the bid/asked spread in heavily-traded large capitalization stocks – Merkin did *not*, in fact, operate *any* legitimate, recognized business. Instead, he was the proverbial "empty" suit who did little, if anything, besides raising investment assets and handing-off the capital, including hundreds of millions in charitable funds, for management *by others*, especially Bernard Madoff and Stephen Feinberg.

4.     As Feinberg's Cerberus Capital Management grew into a $15-20 billion private equity superpower, Merkin eventually disclosed Cerberus, even though Cerberus did not employ the strategies Merkin claimed to employ, i.e., risk (merger) arbitrage and distressed

equity investing.  However, Merkin *never* disclosed his overwhelming dependency on Madoff, and never even discussed Madoff's actual role in any formal communications with his limited partners, even while Merkin shamelessly continued to charge plaintiff KM and numerous other charities huge annual "management" fees, first of 1% of assets under management and, starting in 2003, of 1.5% of assets under management, as if Merkin were actually *managing* the assets and not simply transferring them to someone else.  By 2007, Merkin had built what appeared to the outside world to be a $5.5 billion hedge-fund complex, allegedly based on his exquisite abilities as an asset manager, when all he really had was entree at Madoff and Cerberus.

5.        In fact, Merkin's financial life was a complete fantasy.  And Merkin has continued to market this fantasy in the years since the Madoff arrest.  For example, in a December, 2009, arbitration hearing, when asked by the panel chair what he allegedly did for the $18-28 million in annual "management" fees he extracted from Ascot, Merkin's answer under penalties to perjury was:

THE CHAIRMAN:  So it's in excess of $100 million in management fees.

MERKIN:  It appears to be.

THE CHAIRMAN:  Okay.  What did you do to earn this?

MERKIN:  I think we did exactly what we set out in the document, on the '06 memo, on the first page.  Which was: Supervise the strategy that the fund used.  Retain discretion to award execution of trades pursuant to that strategy to outside managers.  Make sure that there was no creep away from that strategy – at least that the trades represented that strategy.  Arranged for an audit.  Continued to do due diligence.  And to the extent that capacity was an issue with Mr. Madoff, on occasion, try to get some capacity.

THE CHAIRMAN:  What does "capacity" mean?

MERKIN: Investment or investing capacity.

THE CHAIRMAN:  What does that mean?

MERKIN:  If someone wanted to invest funds with Mr. Madoff, someone or some institution wanted to invest funds with Mr. Madoff, and wasn't given a managed account or the capacity, we could, under certain circumstances, ask Mr. Madoff for capacity and get it.

6.    But these answers make no sense.  Merkin did not "supervise" Madoff; that thought is silly.  In addition, elsewhere, Merkin has acknowledged that, with regard to asset managers, such as Madoff, who claim to have perfected "a proprietary, black-box strategy," *no one outside their firm has any real idea how they actually achieve their results.*  See ¶ 111, infra. Likewise, Merkin knew that Madoff prohibited investors from performing any acid-test due diligence, like contacting, on a test basis, Madoff's counter-parties.  Merkin's claim that he was paid to "retain discretion" to award execution to some other broker is equally absurd.  It was critical to Madoff's fraud that Madoff act as his *own* broker and Merkin has elsewhere claimed that Madoff's execution was *second to none.*   Nor was there any reason to believe that Madoff would "creep" away from his professed strategy.  One has only to eyeball the Madoff confirmations to see that, year-in and year-out, Madoff claimed to do *the exact same thing*, he just seemed to have an uncanny ability to time the market and execute the options on just the right day and price.  Similarly, the thought that someone could be paid $18-to-$28 million a year to arrange for an audit is laughable, especially because Merkin never even insisted that BDO Seidman visit Madoff, let alone perform any routine confirmatory testing to see whether Madoff's alleged trading with his options counter-parties was even occurring.  And how could Merkin have possibly concluded that it was rational for Madoff to reject a potential client but happy to let that same client in, through Merkin, for an annual 1.5% fee, *payable to Merkin*, when Madoff was making a small fraction of that on commissions?  It simply boggles the mind.

7.    Numerous arbitration panels have concluded that Merkin engaged in major wrongdoing.  For example, the panel majority in the Wiederhorn case concluded that, in the sale

4

of limited partnership interests in Ascot Partners, L.P. ("Ascot Partners"), Merkin, acting with
*scienter*, violated sections 49: 3-51 and 49:3-71 of the New Jersey Securities Act (New Jersey's
Blue Sky Law). The panel in that case granted Wiederhorn's request for rescission and directed
Merkin to repay $1,462,040 to Wiederhorn's IRA, plus pre-award interest at the New Jersey
statutory rate, upon which Wiederhorn's interest in Ascot Partners would be extinguished. Noel
D. Wiederhorn, MD IRA v. J. Ezra Merkin and Gabriel Capital Corporation, Arbitration Matter
No. 13 148 Y 02937 08 (Amer. Arb. Assoc. May 12, 2010) (**Exhibit A** hereto).

8.      The crux of the Panel majority's opinion was that Merkin "did not make ...
Wiederhorn an informed investor with regard to how his $1,462,040 would be invested"; in
particular, that Merkin "did not disclose material information ... about ... why he was due 1.5%
of assets under management."   The panel majority further determined that Merkin "deliberately"
and "intentional[ly]" failed to disclose that he, Merkin, "was not 'managing' *any* trades and that
he was making *no* investment decisions" for Ascot (italics in original).   "Nor was the Panel
convinced that the degree of ongoing due diligence undertaken by Mr. Merkin met his fiduciary
responsibilities, contrary to the conclusions of Respondents' experts."

9.      In its award in the Wiederhorn case, the panel majority made the specific
factual findings, inter alia, that, with respect to Ascot Partners, Merkin (A) "made *no* investment
decisions other than to forward limited partners' funds to Madoff"; (B) *failed "to clearly and
unmistakably disclose his close financial relationship with Madoff"*; and (C) "deliberately chose
not to" disclose "his reliance on and relationship with Madoff."

10.     The Panel majority also concluded that Merkin "was not equipped on his own
and without assistance of options trading experts to analyze the hard copy data his company was
receiving from Madoff Securities"; that Merkin "fail[ed] to seriously question the overwhelming

trading activity [reported by Madoff] in over-the-counter index options"; and that Merkin "was neither equipped nor willing to seriously probe what he was told by Madoff ... because of the *enormous* fees he [Merkin] was receiving."

11.    As in the Wiederhorn case, the arbitral panel in the case brought by Benjamin Jesselson on behalf of himself and a family trust also granted an award equal to 100% of the amount invested in Ascot Partners, plus pre-award interest.

12.    According to a June 25, 2012 press release, Merkin and representatives of the Office of the Attorney General of the State of New York ("NYAG") have come to an agreement under which Merkin has agreed to pay up to $405 million to investors in his hedge funds, in the aggregate, to settle certain civil claims brought by the NYAG.  The NYAG filed his case, he asserted, on behalf of "all investors" in the Merkin hedge funds whose assets were entrusted to Madoff.  However, according to Merkin's attorney (the NYAG/Merkin settlement agreement is not a public document but the NYAG has not denied this), as a condition to the NYAG/Merkin settlement, Merkin has retained the discretion to prevent KM from participating in the NYAG/Merkin settlement and a lawyer for Merkin (a partner in Dechert LLP) has since advised the undersigned, in no uncertain terms, that KM may *not* participate in the NYAG settlement *unless* Benjamin Jesselson waives his right to collect on a $1.5 million arbitration award which he has already obtained against Merkin.  (Mr. Jesselson obtained that award in an arbitration over investments made by Jesselson family trusts in Ascot and Gabriel, in connection with which Mr. Jesselson had an express contractual right to arbitrate.)

13.    Merkin's position with respect to the above – depriving KM the opportunity to participate in the NYAG/Merkin settlement, with respect to its investments in Ascot Fund, solely because Benjamin Jesselson exercised successfully his contractual right to arbitrate with respect

to *other* investments in *other* Merkin hedge funds – is wrongful and improper.   However, given Merkin's position, KM has no alternative but to pursue its rights through the filing of this lawsuit.

14.        Unbeknownst to plaintiff until Madoff's arrest in December 2008, Merkin's offering memoranda for Ascot Fund and Ascot Partners were rife with fraud.   The February 1996 prospectus represented that Ascot Fund was engaged in three (3) different "arbitrage" strategies, that is, in three market-neutral, virtually risk-fee strategies that were designed to take advantage of "price discrepancies among related securities."   The same prospectus also contained the gross misstatement that the "Investment Advisor selects brokers to effect transactions for the Fund … Such brokers will not perform managerial or policy-making functions for the Fund."   (1996 Ascot Fund Limited Prospectus, **Exhibit B** hereto, at 13)   Merkin plainly committed fraud by using the February 1996 prospectus in 2002 because, by then, both Ascot Partners and Ascot Fund employed a single strategy and that was to entrust all assets to Madoff, who acted as the sole broker, manager *and* custodian.   Despite the fact that Madoff was allegedly managing, and allegedly had custody over, 98-100% of Ascot's assets since 2001, and allegedly had managed, and had custody over, at least 88% of Ascot's assets continuously since 1992, these key facts are not even mentioned in the February 1996 prospectus.   Nor was plaintiff aware of them.

15.        The December 2002 offering memorandum contained the same, utterly false, representation that Ascot Fund was then engaged in three (3) different "arbitrage" strategies, i.e., in three market-neutral, virtually risk-fee strategies that were designed to take advantage of "price discrepancies among related securities."   Indeed, that offering memorandum adds insult to injury by claiming, using the present tense, that the success of Ascot "depends to a great degree on the skill and experience of Mr. Merkin."   (2002 Ascot Partners Offering Memo at 13)   The

same offering memorandum says that Merkin "will devote his best efforts to the management of the Partnership's portfolio." (Page 10)   This was utterly false and misleading because, by 2001, and at all times through 2008, 98-100% of Ascot Fund's assets were (ostensibly) in Madoff's hands for management by *him*, *not* by Merkin.

16.      Many investors in Ascot Fund were also investors in Gabriel Capital, L.P. ("Gabriel"), Ariel Fund Limited ("Ariel"), and/or in Ascot Partners. (Gabriel and Ariel, an off-shore entity, generally invested side-by-side.)  For example, as noted, Benjamin Jesselson and/or Jesselson family trusts were investors in Ascot and/or in Gabriel.   Yet, none of the offering memoranda issued by any of these funds, and no quarterly letters issued to investors, revealed or even suggested the material role played by Madoff in *all* four (4) funds.  Merkin's 2002, and post-2002, offering memoranda were thus materially false and misleading because they failed to disclose that, if one invested in *both* Ascot and Gabriel, one assumed *even more exposure* to Madoff than if one only invested in one fund or the other.

17.      In his offering memoranda, Merkin did disclose that he might entrust assets to outside money managers, so long as those third-party money managers employed investment strategies that were "similar" to those allegedly already being employed by Merkin.  Merkin breached this covenant as well, because, to Merkin's actual knowledge, Madoff's disclosed strategy was not a market neutral "arbitrage" strategy, designed to take advantage of price discrepancies among related securities.  In addition, Merkin also covenanted and represented that, if he did employ three-party managers, he would use "reasonable effort" in selecting them. Merkin breached this representation and covenant because, to Merkin's actual knowledge, Madoff did *not* permit investors to do *any* substantive due diligence on his operation, specifically, to check directly with Madoff's alleged counter-parties in the over-the-counter

(OTC) options market whether the reported billions in options trading was actually occurring. Merkin's failure to conduct any substantive, or formal, due diligence on Madoff was *per se* unreasonable, given the cloud which surrounded Madoff in and after the May 2001 MAR/Hedge expose. (Merkin himself has affirmed under penalties of perjury that, prior to December 2008, Madoff had "lots of skeptics," see **Exhibit C** hereto at 202, but has also confirmed that, prior to November, 2008, he *never* performed any "formal" due diligence on Madoff (see **Exhibit D** hereto).

18.     Plaintiff KM also made and retained these investments based on a stream of quarterly letters to investors (the "Quarterly Letters to Investors"), issued to investors in Gabriel and Ariel. The Quarterly Letters, among other things, repeatedly stressed Merkin's (allegedly) methodical and especially cautious approach to investing. Effective January 1, 2003, the two Ascot funds were re-organized such that Ascot Partners became the "master fund" for Ascot Fund; that it, effective January 1, 2003, Ascot Fund itself simply became a single, albeit large, limited partner in Ascot Partners.

19.     All of the foregoing representations and nondisclosures, and the numerous others specified below, were false and misleading, and materially so. As a direct, proximate and foreseeable result, plaintiff KM lost $1,500,000, a sum which could have and, in the absence of Merkin's fraud, would have been gifted to deserving causes. Essentially the same conduct also violated defendants' fiduciary duties to make full, complete and candid disclosure.

20.     In addition, as demonstrated below, much of Merkin's conduct was intentional, deliberate, and/or an extreme and indefensible departure from ordinary care. He deliberately failed to make full and proper disclosure of Madoff or, at a bare minimum, of his reliance on an outside manager for 98-100% of Ascot's investments, using a strategy that had

nothing to do with arbitrage of related securities.  Merkin also deliberately failed to tell his investors, in clear and unmistakable language (as Merkin colleague Sanrda Manske did), that, for 50% or so of the $5 billion plus in assets ostensibly under his management, Merkin relied upon a single, third-party money manager who also acted as his own custodian and broker – and that Merkin disclaimed any duty to perform due diligence on the account documentation he received from that broker.  Merkin also deliberately failed to disclose that investors in Ascot, Gabriel and Ariel that there was material *overlap* in how the funds were allegedly invested, and hence that investors either had total, or substantial (20-30%), exposure to Madoff in *all* these funds.   He also knowingly failed (or recklessly disregarded his duties), in the face of numerous red flags, to insist on conducting due diligence of a kind that was required in the circumstances to establish that Madoff was "for real," such as obtaining direct confirmations of the options activity, on a test basis, from Madoff's OTC options counter-parties.

21.     Finally, as shown below, Merkin failed to disclose: (A) that Madoff did not permit investors to conduct any formal due diligence on him; (B) that Merkin did not, in fact, conduct any analytical due diligence on Madoff; and (C) that Merkin had no idea how Madoff's supposed (i.e., claimed) investment strategy supposedly worked.

22.     As shown below, "[a] simple inquiry to one of several third parties could have immediately revealed the fact that Madoff as not trading in the volume he was claiming." (Executive Summary, SEC Report of Investigation, Case No. OIG-509, **Exhibit E** hereto, at 20)

23.     In addition, as the SEC office of independent investigations has found, "[n]umerous private entities conducted basic due diligence on Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was simply too risky." (Excerpts from full OIG Report, **Exhibit F** hereto, at 424)

24.     By deliberately excluding KM from the NYAG settlement, Merkin adds insult to injury *against a charity* even as he continues to pretend that he is entitled to be treated in the Orthodox Jewish community as an individual entitled to honors and great respect.[1]  In truth and in fact, Merkin is an adjudicated and deliberate violator of state-securities laws who, even now, continues to act unscrupulously by denying plaintiff KM and certain other non-profit foundations the right to participate in NYAG settlement.  It is that, latest example, of shameful conduct that has necessitated the filing of this action, as herein below set forth in detail.  Therefore, by this action, in addition to full compensatory awards, including pre-judgment interest, plaintiff seeks punitive damages of at least $5 million from Merkin.  Any punitive damages awarded, in excess of costs and fees, will be donated to charities in accordance with plaintiff KM's usual polices.

**Parties and Subject Investments**

25.     Plaintiff Keren Matana ("KM") is a not-for-profit organization which was formed on May 8, 1983, under, and it continues to exist under, the laws of the state of Israel.  Its principal place of business is located in Tel Aviv, Israel.  In 2002 and 2004, its members, who, *inter alia*, appoint KM's executive committee, included Benjamin Jesselson and Phyllis Jesselson.  At present, its members are Aron Trattner, CPA, and Phyllis Jesselson.

26.     On or about October 1, 2002, KM invested $1,000,000 in the participating shares of Ascot.  KM made this investment in Ascot pursuant to certain offering materials issued by or on the instruction of Merkin (including a February 1996 prospectus, Exhibit A hereto); the manner by which Merkin held himself out to the investment community (*i.e.*, as a manager of direct investments, *not* as a manager of a fund-of-funds or as a mere financial conduit or funnel); certain explicit oral representations, made by Merkin, as to how he managed his hedge funds

---

[1] For example, on Purim 2013, celebrated in New York on February 23-24, 2013, Merkin once again read from *Megilath Ruth*, a very high honor bestowed by Fifth Avenue Synagogue.

including Ascot; certain historical performance data for Merkin's hedge funds, including Ascot; and the especially consistent and seemingly conservative performance history of Ascot in and since the protracted bear stock market which had begun in late 2000 and which continued through the 3rd fiscal quarter of 2002. KM then *retained* the entirety of this investment based upon, *inter alia*, Merkin's continuing representations as to how he managed his hedge funds including Ascot; Merkin's ever-growing reputation as an asset manager; Ascot's apparently consistent and conservative performance; and its audited annual financial statements.

27.     On or about January 1, 2004, KM invested $500,000 in the participating shares of Ascot. KM made this investment in Ascot pursuant to certain offering materials issued by or on the instruction of Merkin (including an Ascot Partners offering memorandum dated December 2002); the manner by which Merkin held himself out to the investment community (*i.e.*, as a manager of direct investments, *not* as a manager of a fund-of-funds or as a mere financial conduit or funnel); certain explicit oral representations, made by Merkin, as to how he managed his hedge funds including Ascot; certain historical performance data for Merkin's hedge funds, including Ascot; and the especially consistent and seemingly conservative performance history of Ascot in and since the protracted bear stock market which had begun in late 2000 and which continued through late 2002. KM then *retained* the entirety of this investment based upon, *inter alia*, Merkin's continuing representations as to how he managed his hedge funds including Ascot; Merkin's ever-growing reputation as an asset manager; Ascot's apparently consistent and conservative performance; and its audited annual financial statements.

28.     During 2012, KM contributed sums of up to $50,000 to over 60 organizations. Over the last five years, KM has distributed approximately $2.2 million to worthy causes. Its assets per its most recent year-end financial statement totaled approximately $3 million.

29.     Defendant Merkin is an individual who, at all relevant times, resided, and he still resides, at 740 Park Avenue, New York, New York.   In addition, at all relevant times, Merkin maintained, and he still maintains, an office for the conduct of business at 450 Park Avenue, New York, New York.

30.     As alleged more fully below, at all relevant times, Merkin held himself out to be an asset *manager par excellence*, i.e., as possessing the unique blend of expertise, insight, experience and skill required to sniff out reasonably safe, yet consistently profitable, direct, investments – on a scale large enough to meet the needs of his multi-billion dollar hedge-fund complex (over $5 billion by 2006). In fact, Merkin was no investment manager at all. He was simply an asset gatherer who overwhelmingly left the chore of deciding what direct investments to make, on what terms and conditions, in what amounts and time frames, and how to hedge them, entirely to others.

31.     Defendant Gabriel Capital Corporation ("GCC"), which was previously known as Ariel Management Corporation, is a Delaware corporation which, at all relevant times, and today, maintains a suite of offices and trading facilities at 450 Park Avenue, New York. According to Merkin's offering materials, GCC was the "Investment Advisor" to Gabriel, Ariel and, prior to January 1, 2003, to Ascot Fund. Also according to Merkin's offering materials, Merkin has, at all relevant times, owned, and today owns, 100% of the capital stock of GCC. In point of fact, GCC was a mere instrumentality or alter ego of Merkin and, as the NYAG has found, Merkin commingled assets of GCC with his own. (NYAG Amended Complaint ¶ 125) ("Merkin also moved tens of millions of dollars unrelated to Ascot, Ariel, and Gabriel fees and expenses through the GCC accounts, depositing other personal and family monies, making loans to himself or family trusts, and making investments on his own behalf, ... Merkin used GCC

funds to make purchases for his personal benefit, including purchases of over $91 million of artwork for his apartment ...   As a result of this commingling of funds and the use of corporate funds to pay for personal items, the Attorney General does not have a complete accounting of the financial benefit Merkin received and will receive from Ascot, Ariel, and Gabriel...").

### Jurisdiction

32.      This Court has jurisdiction over this matter pursuant to 28 U.S.C § 1332(a)(1) and (2) based on the parties' complete diversity of citizenship.  Plaintiff is a company formed and existing under the laws, rules and regulations of Israel, whose principal office and place of business is located in Tel Aviv, Israel.  In addition, the amount in controversy, exclusive of interest and costs, exceeds $75,000.  This court has personal jurisdiction over Merkin because he resides, maintains offices and regularly and systemically conduct business in this District and because the claims alleged herein largely arise from representations, omissions, other tortious conduct and breaches of contractual duties which occurred in the state of New York.

### Venue

33.      Venue is proper in this District pursuant to 28 U.S.C § 1391(a)(1) and (2) because, at all relevant times, Merkin maintained, and he still maintains, his residence and principal place of business in this District and because a substantial part of the events and omissions giving rise to the subject claims occurred in this District.

## Additional Facts[2]

34.      The Jesselson family is an especially well-known and well-respected Jewish-American family.  Its roots are in New York, New York.  The patriarch of the family, Ludwig Jesselson (1910-1993), was a highly successful businessman and philanthropist.  He was the longtime chairman and chief executive officer of Philipp Brothers.  Based in Manhattan, Philipp Brothers grew to be one of the world's largest marketers of raw materials, bartering more than 150 basic commodities, including steel, crude oil and cement, in *many* different countries.  After its purchase by Englehard Minerals, Philipp was subsequently spun off in 1981 as Phibro Corporation.  That same year, Phibro acquired Salomon Brothers, creating Phibro-Salomon.  In 1986, the combined company continued under the name Salomon, Inc., until its sale to Travelers in 1997.  Ludwig Jesselson served as a director of Phibro Corporation, Phibro-Salomon and Salomon Inc.

35.      Ludwig and Erica Jesselson were also extremely active philanthropists in the Jewish Community in both America and Israel.   Among other things, Ludwig was simultaneously Chairman of the Board of Trustees of Yeshiva University (YU), Chairman of Bar Ilan University in Israel, Chairman of the Shaare Zedek Hospital in Jerusalem, and Chairman of the National Jewish Library in Israel.  He was a founder of the Albert Einstein College of Medicine and a founder of the SAR Academy, a Jewish day school in Riverdale, New York which currently has approximately 1,300 students.  Mr. Jesselson was also Chairman of the general campaign of UJA/Federation of Greater New York.  In 1973, he and wife, Erica, founded

---

[2]  This Complaint sets forth the backgrounds of the Jesselson family and of the defendant in some detail so the Court will understand why the principals of KM, in 2002-2008, vested total confidence and trust in a person like Ezra Merkin.  In part they did so based on their shared Orthodox Jewish faith (i.e. their deeply-shared religious background), their commitment to common communal causes, including YU and Israel, and as well as the image carefully cultivated by Merkin that he was an investment "guru" or genius.

the Yeshiva University Museum. They not only supported construction and operating expenses but were responsible for contributing many important works of art and items of great historical importance to that Museum and to many other cultural institutions both here and in Israel. Among other institutions, Mr. and Mrs. Jesselson gave major support to the Weitzmann Institute and the Haifa Technion. To encourage originality and excellence in Judaica design, Mr. and Mrs. Jesselson also established the Jesselson Prize for Contemporary Judaica Design, awarded by the Israel Museum to an outstanding Jewish artist. The Jesselsons were among the most respected leaders in the Jewish community both here and in Israel. When Ludwig passed away, more than 350 obituaries and remembrances appeared in *The New York Times*.

36.     Erica Jesselson (Benjamin's mother) passed away in 2008. Their children, including Benjamin Jesselson and Michael Jesselson, have continued to support numerous Jewish causes. Benjamin Jesselson is a dual citizen of Israel and the United States and resides in Jerusalem. Michael Jesselson is a U.S. citizen who resides in New York. When Ludwig passed away, Michael Jesselson joined the YU Board of Trustees and he has remained a member of that Board to this writing.

37.     Ezra Merkin is the eldest son of a highly successful and strictly Orthodox Jewish-American entrepreneur, Hermann Merkin. The elder Merkin, who was born in Leipzig, Germany, in 1907, fled the Nazis, moved to New York in 1940.

38.     After serving in the Army, he formed an investment bank and brokerage known as Merkin & Co., with seats on the NYSE and American Stock Exchange. Hermann Merkin was also one of the original investors in Maritime Overseas Corp. (MOC), which was started in 1948 by Raphael Recanati. MOC was eventually merged into the Overseas Shipping Group (OSG), an NYSE-listed company, which grew to become one of the most successful

tanker companies in the world.  Hermann Merkin was a shareholder for decades and sat on its board.

39.     Hermann Merkin became very wealthy and, among other things, endowed Merkin Concert Hall at Lincoln Center.  He was also a founder and first president of the Fifth Avenue Synagogue ("FAS") in Manhattan.  FAS is often said to be the most preeminent, and wealthiest, Modern Orthodox synagogue in the world.

40.     Hermann Merkin's wife, Ursula, is a descendent of Samson Raphael Hirsch, a famous theologian and one of the founders of Modern Orthodoxy in Germany in the mid-1880s.

41.     Merkin, who was born in April, 1953, attended the prestigious Ramaz School, attended at least one *yeshiva* in Israel, was graduated from Columbia University *magna cum laude* and Phi Beta Kappa, and was graduated from Harvard Law School, ostensibly with honors.

42.     After law school, Merkin became a Bankruptcy and Restructuring specialist at Milbank Tweed (1979-1982).    Merkin then gravitated to the world of asset management, affiliating, for some 6-7 years, with two gentlemen who are or were considered luminaries in the field.

43.     First, for approximately three years (1982-1985), Merkin worked with Alan B. Slifka at a firm now called Halcyon Asset Management LLC.  Slifka, who was a securities analyst with L.F. Rothschild for 32 years, founded Halcyon in 1981 for the single purpose of investing high net worth individuals in merger or risk arbitrage.  Mr. Slifka, who was born 1929, was a graduate of Yale College and Harvard Business School.  He passed away in 2011, leaving a $10 billion firm.

44.     Then, in 1985, Merkin left Halcyon and joined newly-formed Gotham Capital.  There, Merkin had the title of "managing partner" and worked with Joel Greenblatt.  Greenblatt

was graduated from the Wharton School with a B.S. (1979) and an M.B.A (1980).   Greenblatt

quickly established himself as a very prominent and esteemed investor.   Greenblatt's specialty

was and is value investing.   He later wrote several leading books on investing, including The

Little Book That Beats the Market.

45.      Greenblatt and his partners followed a strategy combining value and special situation investment approach with the goals of capital preservation and long-term capital appreciation.

46.      Although Merkin claims to have analyzed investments with Halcyon and Gotham, it appears his major, if not exclusive, role was fundraising. After approximately three years with Gotham, Merkin left and founded and managed his own investment limited partnership, Ariel Capital, L.P. (later known as Gabriel Capital, L.P.). During this period (1989-1991), it appears that Merkin largely raised money for another merger arbitrage specialist, Victor Teicher & Co.

47.      Teicher was a highly competent financial analyst. However, on April 6, 1990, a jury convicted Teicher on multiple counts of securities fraud for trading on the basis of material non-public information. Although this hardly terminated Merkin's and Teicher's alliance (they worked together closely for approximately another ten (10) years, even while Teicher was incarcerated, Merkin needed a fresh source of investment "ideas." He turned to two main sources – Stephen Feinberg at Cerberus Capital Management ("Cerberus") and to a friend of his father's, Bernard Madoff.

48.      Merkin began to introduce his contacts to Madoff in or by the second quarter of 1990. (JEM-AAA079828)  At or about the same time, Merkin also began to raise funds for Stephen Feinberg at Cerberus. However, Merkin was unwilling to be perceived as, or to be compensated as, a mere financial intermediary (i.e., as an introducer). Therefore, when he struck out on his own -- like Slifka and Goldblatt -- Merkin claimed to be an asset *manager* too. Thus, when he issued his first offering memorandum for Ascot Partners, dated November 1992,

Merkin actually claimed that Ascot "will engage primarily in risk arbitrage, investments in private debt claims and publicly traded securities of bankrupt and distressed companies and engage in indirect investments" in other investment vehicles "which engage in similar investment strategies" – *in other words exactly the same things that his extant funds engaged in.* These representations were utterly false since, as noted, Ariel Fund (whose business *was* to invest in distressed securities and engage in risk arbitrage) pre-existed Ascot and Merkin formed the *new* fund, Ascot, solely to batch the accounts which he had introduced to Madoff and to continue to charge the 1% fee on them.

49.     Throughout the 1990s, Merkin continued to act largely as an undisclosed fundraiser for Madoff, Feinberg and Teicher. He also began to accept assets from charitable institutions and non-profits. In 1993, Merkin was named Chairman of the Investment Committee of the YU Board of Trustees despite the fact that Merkin was not yet even a Trustee of YU. In 1996, with Merkin's active support, Madoff became a Trustee of YU and, in 2000, Chairman of the Board of the business school at YU. In 2001, Merkin and his wife endowed the "Merkin Family Chair in Jewish History and Literature" at YU. In 2002, Merkin was made a Trustee of the YU board. Following in his father's footsteps, Merkin also became president of the Fifth Avenue Synagogue. By 2007, Merkin was serving on the boards of trustees or directors for a number of prominent non-profit institutions, including YU, UJA/Federation and the Gruss Foundation. He also sat on the board of Yeshiva University's rabbinical school as well as on the board and investment committee of Ramaz. In November 2007, as a result of his strategic alliance with Stephen Feinberg and Cerberus, Merkin also became Chairman of the Board of General Motors Acceptance Corporation (GMAC).

50.     By 2006-2007, Merkin had succeeded so thoroughly in creating an image as an investment guru that he was asked to contribute commentary in his area of supposed expertise – bankruptcy and reorganizations – for the new edition of a classic book authored by Benjamin Graham and David L. Dodd, *Security Analysis*.  The book was long-regarded as the "bible" in the field in so-called "value investing," typified by Warren Buffett.  Merkin was so successful in creating this image that even the luminaries of Wall Street, such as Leon Levy (co-founder of a famous hedge fund, Odyssey Partners), sung his praises.

51.     According to his disclosure documents, Merkin formed Ariel Fund, a Cayman Islands exempted company, on December 28, 1988, to facilitate investment by non-U.S. taxpayers and other persons in risk arbitrage and investing in distressed securities.  According to his disclosure documents, Merkin formed Gabriel, a Delaware limited partnership formerly known as Ariel Capital, L.P., to act as a private investment limited partnership for U.S. taxable investors, on January 1, 1991.  Gabriel and Ariel generally invested on a side-by-side basis in the same securities.  According to his disclosure documents, Merkin formed Ascot Fund, a Cayman Islands exempted company, in 1991.     Effective December 31, 2002, Ascot Fund was reorganized to act solely as a feeder fund for Ascot.  After a period when he placed no Gabriel or Ariel assets with Madoff, starting in late 2000, Merkin began to place 10% or more of Gabriel's and Ariel's assets with Madoff.

52.     According to Merkin's initial offering memoranda for Gabriel and Ariel, these funds were formed primarily to engage in the two (2) lines of business in which Merkin supposedly developed great skill before striking out on his own in 1989 -- merger or risk arbitrage and investing in distressed securities.  By 2006, Merkin's offering material for Gabriel and Ariel emphasized that these funds engaged primarily in distressed investing, risk arbitrage

and some private equity investments.   But despite the fact that Gabriel had continuously entrusted a significant percentage of its capital to Madoff since late 2000, the 2006 offering memoranda for Ariel and Gabriel fail to disclose that some 20%-30% of Gabriel's and Ariel's investment assets (i.e., its assets other than cash) were *not* deployed in distressed investing, risk arbitrage or private equity at all but rather had simply been entrusted to Madoff.

53.   In addition, contrary to Merkin's offering materials, overwhelmingly Gabriel and Ariel did not engage in any direct investments which were researched, analyzed or structured by Merkin.   Overwhelmingly, Gabriel and Ariel were simply funds-of-funds whose assets were simply entrusted to Madoff; held in cash; placed in investment funds formed and managed by Feinberg and Cerberus and/or in direct investments which were originated, structured and overseen by Cerberus; and/or placed in investments which were originated, structured and managed by Cohanzick Asset Management ("Cohanzick").

54.   By the 2000s, Merkin would likewise claim, in formal presentations of Ascot, that Ascot was an *arbitrage* fund; that it could and would *short* the underlying equities when market conditions dictated it (an utter falsehood, Madoff never did that); that Ascot had a "12 minute" rule under which Ascot had to leg into an options spread within 12 minutes or sell the trade legs which had been established; and that "essentially Ascot is no different than flipping a coin, but trades are structured so that Ascot can be right only 25% of the time and still be able to break even" (see **Exhibit G** hereto, minutes of a November 14, 2006, meeting of the finance committee of New York Law School, and **Exhibit H** hereto, a memorandum prepared by Spring Mountain Capital and Aozora of November 14, 2005, on-site visit with Merkin).   In other words, over the years, and Merkin's own reputation grew, even to investors who knew that Ascot kept its money at Madoff, Merkin would claim, at a bare minimum, that he and Madoff *co-managed*

Ascot, in order to justify his (Merkin's) enormous fees (for 2003-2007, for Ascot alone, $18-28 million per year). In the 2005 memorandum (Exhibit H hereto), the Spring Mountain Capital and Aozora representatives write that, "Ezra estimates the fund is in cash 10-25% of the time and is fully invested (less 30 bps of cash held by the CFO) during the other time periods. Cash balances are held at Morgan Stanley and are not aggressively managed. Most of the time short term treasuries are bought as the available cash needs to be invested in short duration paper." (emph. added)[3]  Similarly, a March 21, 2004, YU conflict-of-interest report, JEM-AAA079866, describes Madoff as merely the "executing broker" for Ascot.

55.    Merkin also concealed Madoff in the marketing literature for Merkin's Gabriel Capital Group. Powerpoints dating from 2006-2008, refer to a "strategic alliance" with Cerberus but say nothing about the billions ostensibly being held and managed by Madoff. Here is a biography and fund description which Merkin used in early 2008:

"J. Ezra Merkin

"J. Ezra Merkin has been the Managing Partner of Gabriel Capital Group ["GCG"] and its predecessor firm since 1985. The Group manages over $5 billion in a family of funds that focuses on private equity, distressed investing, middle-market lending, and options arbitrage, among other strategies. Mr. Merkin also serves as Chairman of the Board of Directors of General Motors Acceptance Corporation. Prior to his career in finance, Mr. Merkin was associated with the law firm Milbank, Tweed, Hadley & McCloy.

"Mr. Merkin, who was graduated from Columbia College and Harvard Law School, is a Governor of the Levy Economics Institute of Bard College in Annandale-on-Hudson, New York, a member of the Board of Visitors of Columbia College, and a Trustee of Carnegie Hall in New York, the Beyeler

---

[3] Thus, on a key point -- custody -- it is plain that *Merkin* misled the SMC and Aozora attendees. Morgan Stanley did *not* hold Ascot's cash balances when Ascot was not invested. Supposedly, Madoff did. But by artfully creating the impression that *Morgan Stanley* held Ascot's assets while the fund was not invested, Merkin could greatly reduce, if not entirely eliminate, prospective investors' concerns over the rumors, or "skepticism," which surrounded Madoff after the May 2001 MAR/Hedge expose and Madoff's inexplicably consistent, positive performance in each fiscal quarter of the protracted bear market in stocks of 2000-2002.

Foundation and Museum in Basel, Switzerland, and the Gruss Foundation. In addition, he serves as a Trustee and chairs the Investment Committees of Yeshiva University and of UJA/Federation of New York."

56. By this time, approximately 50% of Merkin's total AUM was in fact in the exclusive custody and control of Madoff. Wiring money to Madoff thus constituted by far the single largest "investment" by Merkin of his AUM – or Merkin's *predominant* strategy. Yet, in the above description, Merkin does not so much as mention Madoff, or Merkin's collared equity strategy (which is no arbitrage strategy), or give anything close to an honest explanation of how Madoff claimed to be investing money.

57. To say that GCG "focused" on four strategies -- private equity, distressed investing, middle-market lending and "options arbitrage" – while leaving out Madoff -- was a blatant distortion. Madoff himself did not describe his alleged strategy as "options arbitrage." Instead, Madoff claimed that his alleged strategy consisted solely of buying 50 OEX stocks, buying a sufficient number of S&P100 index puts to *hedge* this position entirely, and selling approximately the same number of S&P100 index calls to *finance*, in part, the purchase of the puts. This strategy can produce a profit only if the broad market, as measured by indices such as the S&P100, moves up after the position is established. As Merkin well knew, people who engage in *arbitrage* are *indifferent* to the overall movement in the market. They buy and sell options owing to short-term pricing inefficiencies or anomalies. They do *not* use options solely to *hedge* a long position in stocks that might be held for a period of weeks if not months, as Madoff was allegedly doing.

58. Merkin left out any explanation for around 50% of his strategy to make it appear that *he* was the investment "guru," able to deploy other people's assets across a wide spectrum of alternate strategies, and to create the all-important appearance of real diversification.

24

Merkin's offering documents, as shown below, were no more enlightening. Indeed, as shown below, Merkin was like the Wizard of Oz, hiding behind the curtain until the totally unexpected arrest of Madoff on December 11, 2008.[4]

59.     There is a fundamental difference between an asset or portfolio manager (*i.e.*, one who makes *direct* investments based on his own skill and expertise) and a so-called "fund of funds" manager, an individual who merely selects *others* to do the asset management. First, because the latter is simply an intermediary, the market values the services differently. Generally, even accomplished fund-of-funds managers are compensated much less generously than individuals who manage assets directly. In addition, three of the major services which the market expects from a fund-of-funds manager are: (a) professional risk management (that is, professional appraisal of risk/reward characteristics of direct investments using a systematic approach); (b) proper risk diversification; and (c) due diligence, including constant and real-time assessment of fraud and custodial risk. Merkin's offering memoranda for Ascot grossly misrepresent that Merkin was the key man in Ascot's historic success. He offering memoranda for Ariel and Gabriel likewise fail to disclose that *others* were overwhelmingly responsible for their success. In addition, as the arbitration panel in the <u>Wiederhorn</u> arbitration determined, Merkin deliberately disregarded the apparent risks and incongruities in the professed Madoff strategy, and willfully accepted that he could not perform any significant due diligence on Madoff, by reason of the huge annual fees that Merkin was able to extract from the situation.

---

[4] Merkin wanted to cultivate the image as an investment guru because, as shown below, he could not have possibly attained positions on investment committees, on boards of trustees, or as Chairman of GMAC, as a mere asset-gatherer. So Merkin took enormous, undiversified, inexcusable risks with other people's money just to burnish his own reputation, and to create the appearance of being a Wizard. That is absolutely intolerable conduct – which has caused huge damage to countless foundations and charities – and should be soundly condemned by this Court in the clearest of terms.

**Merkin Was Repeatedly Warned about Madoff**

### Victor Teicher

60.        Victor Teicher, in the NYU litigation, N.Y. Supreme Court, New York County, 8603803/2008, testified that he warned Merkin explicitly that Madoff's alleged returns "were inconsistent with what could possibly take place in reality" and that such returns "were just not possible" – "you just can't year in and year out have such low volatility in the returns." (Tr. of Feb. 9, 2009, deposition at 14, 41)   Teicher also testified that he told Merkin's CFO Michael Autera that Madoff's trading tickets "didn't smell right" (id. at 54) and that a former Gabriel accountant, Andrew Gordon, had expressed the view that "many tickets had come in late" and that Madoff "looked like a fraud to him" (id. at 21).

61.        Merkin can hardly claim that Teicher's opinion did not matter to him.  Even after Teicher was indicted for insider trading (in late 1988) and convicted of that crime (in 1990), over the period 1988 to 2000, Merkin relied very significantly on Teicher to manage assets Merkin had raised.  (Id. at 107-117, 120-138, 145-147, 163-165.)

62.        In one 14-month stretch in 1998-2000, working for Merkin, Teicher made around $1 million a month, or $14 million, all told.  (Id. at 165-66)

### Jack and Joshua Nash

63.        According to the state-court complaint filed by the NYAG, there were numerous other investors, such as Jack Nash and his son, Joshua, who could not get comfortable with Madoff's proffered explanations and either withdrew their money or never invested.[5]

---

[5]  Per internet reports, Nash was a Wall Street heavyweight.  He fled the Nazis as a youth; went to Stuyvesant High School and City College; rose up the ranks at Oppenheimer to become its president and chairman in the late 1970s; sold Oppenheimer; and formed Odyssey Partners with Leon Levy in 1982. Odyssey was one of the most successful hedge funds of all time, but Nash and Levy famously decided to close it in 1997.  Thus, Nash's opinion of Madoff deserved an especially high level of respect and careful investigation by Merkin.

**Many Others Were Very Suspicious of Madoff**

64.      In his November 7, 2005 report detailing why he was "very suspicious" that Madoff's alleged returns "aren't real" ("The World's Largest Hedge Fund Is a Fraud"), Harry Markopolos wrote: "Of course, no one wants to take undue career risk by sticking their head up and saying the emperor isn't wearing any clothes." Yet (at pp. 12-13 of his report) Markopolos identified the following persons as having voiced the opinion that Madoff "is a fraud": Leon Gross, Managing Director, Citigroup's worldwide equity derivatives unit; Walter Haslett, CFA, Write Capital Management; and Joanne Hill, PhD, Vice President and global head of equity derivatives research for Goldman Sachs.

65.      The following persons or entities, among others, had also concluded, prior to 2008, that it was imprudent to invest with Madoff because of his non-transparent strategy: Merrill Lynch, Sterling-Stamos, Noreen Harrington, James Vos (Credit Suisse and, later, Aksia), Ken Nakayama, James Hedges IV, Gregory Stahl, Seabridge Partners, and Howard Wohl (who wrote, in a June 29, 2001 email, "Madoff can personally bankrupt the Jewish community if he's not real").

**Merkin Performed No Substantive Due Diligence**

66.      Well prior to his arrest in late 2008, there were numerous red flags surrounding Madoff, among them, (1) that he acted as his own custodian of securities and did not use an administrator; (2) that he did not charge management fees or performance incentives, but was supposedly content to make a profit just on trading and brokerage; (3) that he steadfastly refused to explain his supposed "strategy" to others in any level of detail; (4) that, using the same investment technique (taking a long position in a broad basket of stocks, collared by index options), *no* other investor or broker had attained anywhere near the success Madoff had claimed

since 1980 (see May 2001 MAR/Hedge article); (5) that Madoff used a tiny, "strip mall," auditor consisting of just 2-3 persons, Friehling & Horowitz; (6) that, in executing his alleged options transactions, Madoff allegedly relied almost exclusively on OTC, or private market, options, whereas standard CBOE options would have been much cheaper to employ; (7) that none of the billions and billions of dollars of alleged options trading by Madoff's alleged counter-parties ever seemed to spill over into the public market; (8) that over decades, Madoff so consistently could seemingly buy low and sell high in the options market; (9) that Madoff's highly sophisticated alleged counter-parties in the options market would continue to trade with him after allegedly "losing" so many billions of dollars to him; (10) that Madoff seemingly could maintain an informational advantage, in the options markets, over firms that were *a hundred times* larger than Madoff; (11) that Madoff family members acted as chief compliance officer and chief compliance counsel to his firm; (12) that Madoff, a pioneer in computerized trading, issued only antiquated-looking paper transaction confirmations and monthly account statements; (13) that Madoff's alleged strategy appeared to be infinitely scalable; and (14) that Madoff always reported being "out of the market" and in Treasuries at the end of *each* fiscal quarter, at least in and after 2003.

67.     In addition, Merkin was well-aware that stock-picking and market-timing hardly explained Madoff's unparalleled record of consistent profitability (never reporting a losing year since 1980; never reporting a losing fiscal quarter since Merkin started introducing clients to him in early 1990; reporting annual returns of 10-16% (sometimes more) almost every year for 28 years). Indeed, Merkin was well-aware that Madoff's reported profitability depended largely on his alleged success in almost always buying low and selling high in the over-the-counter market – not the public market -- for S&P100 index *options*. In this clandestine market,

tiny Madoff Securities (consisting of no more than 200 traders and other market professionals) could not possibly have enjoyed an informational advantage (in terms of being able to predict the short-term future movements of a broad stock index such as the S&P100 index) than, say, Goldman Sachs, Merrill Lynch or Morgan Stanley (with their tens of thousands of employees). Yet, Merkin never once even asked to Madoff to allow him to confirm the alleged OTC options transactions (often in reported amounts of $10 million, $20 million or $50 million, or more, per trade) with Madoff's purported counter-parties.

68.     It is likewise beyond argument that Merkin, who held over $2.4 billion in assets at Madoff by 2007-2008, at least had a duty to read Madoff's Form ADV. Yet, Madoff's Form ADV, dated January 7, 2008, states, under penalties of perjury, that Madoff Securities LLC had "$17,091,640,696.00" in assets under management, held in just "23" accounts. (Response to Item F(2))  Merkin was well-aware that, in addition to Madoff's market-making activities, Madoff was managing many hundreds, if not thousands, of investor accounts. Thus, Merkin was well-aware that Madoff did not manage just 23 accounts. Madoff reported just 11-25 clients in his 2007 Form ADV and zero clients in 2006 Form ADV. Hence, Merkin knew or should have known that Madoff's Form ADV might well subject him (Madoff) to criminal liability. Yet, Merkin did absolutely nothing to investigate or document his concerns.

69.     As the panel in the Wiederhorn v. Merkin arbitration found:

"[T]he evidence showed that Madoff knew that Mr. Merkin was not seriously second-guessing anything that Madoff told him.  Ponzi schemers look to the weaknesses or flaws in the system of compliance or supervision and then 'trade through the cracks.' The flaw in Mr. Merkin's system, based on the Panel's evaluation of the evidence, is that Mr. Merkin was neither equipped nor willing to seriously probe what he was told by Madoff.  Nor did the record show that Mr. Merkin ever reviewed, on a daily or periodic basis, the monthly account statements and trade confirmations that were received (which alone should have raised a question never asked by him concerning the backward reporting on the confirmation of commissions for purchases and sales).

Nor did Gabriel [Capital Corp.'s] Chief Financial Officer, Mr. Autera, provide any substantive surveillance of Madoff's trading activities."

Noel D. Wiederhorn IRRA v. Merkin, No. 13 148 Y 02937 08, 2010 WL 3277432 (Amer. Arb. Assoc. May 11, 2010) (Exhibit A) at 7.

70.     As the panel in the Wiederhorn case also found:

"Neither Mr. Merkin nor Dr. Wiederhorn were equipped to understand and seriously question the problematic paper trade confirmations issuing from Madoff Securities or the astronomical OTC options trading that Madoff was, supposedly, engaging in. However, Mr. Merkin had an obligation, under the law, to understand." (Award at 8)

71.     Thus, the Wiederhorn panel concluded:

"The Panel believes that Mr. Merkin's failure to read Madoff's trade confirmations (which would have raised the question, in 2006, of principal trades becoming agency trades and buy/sell trade confirmations that appeared to be inconsistent with the trades they purported to memorialize); his failure to seriously question the overwhelming trading activity in over-the-counter index options; and, his failure to seriously question how Madoff's 'Midas Touch' trading strategy never stumbled, month after month, year after year, was negligence on his part and the negligent breach of his fiduciary duties to Wiederhorn." (Award at 21) (emph. added)[6]

72.     According to her sworn testimony, in the summer of 2003, one Noreen Harrington was chief investment officer for hedge fund Sterling-Stamos. In a deposition given last year in case before Judge Rakoff, Ms. Harrington testified (1) that in the summer of 2003, she had a meeting with Merkin to discuss a proposed investment by Sterling Stamos in Ascot; (2) that in the meeting Harrington described to Merkin the due diligence process that Sterling Stamos wished to undertake; and (3) that in the same meeting Merkin rebuffed Harrington's efforts to perform any due diligence on Madoff, telling her: "You don't get it do you? -- You don't get it, do you? This is a privilege. You don't get to ask questions." In the same

---

[6]  If Madoff had really begun to act as Ascot's agent, and if he was really buying and selling options for Ascot's account OTC, he would have had to have opened an account in Ascot's name, *and in the name of every one of his thousands of money management accounts*, with every OTC counterparty with whom Madoff allegedly did business around the world. Merkin should have immediately recognized the sheer implausibility of Madoff's contention that he was buying and selling options *as agent* for so many accounts all around the world.

deposition, Harrington testified that she resigned from Sterling Stamos as a result of the decision to invest with Madoff.

73.    Similarly, in a transcribed tape recording, produced by Merkin, of a January 14, 2002, conversation between Madoff and Merkin, Merkin tells Madoff: "I can always tell when people are going to ask me about Bernie, because when people come into the office … they look around and say, 'I know I'm not supposed to talk about this, but can I ask you the following question?' So I told one person, 'Look, you can ask me about how Bernie does it and that's fine, but when are you going to ask Bernie?' So *he* said, 'Look, if I asked him he'd throw me out.' *I* said, 'Look, all I can tell you is don't ask so many questions. Sit tight.' *And that's what I tell everybody.* Would I give money to Bernie Madoff before Ezra Merkin? I say *always.* But even I believe in a *little* diversification…" (**Exhibit I** hereto, itals. added).

74.    In addition, Merkin's right-hand man, Michael Autera, a CPA, has admitted *under oath* that the Merkin organization lacked a due diligence team: "there was no diligence team. I'm not aware of that function being – being done" [assessment of whether "adequate numbers of puts were being purchased and adequate numbers of calls were being sold"] (Wiederhorn Tr. 1207).

75.    Autera testified to the same effect in the Jesselson hearing:

"Q.    I think we've had this before in another context, but let me confirm. You agree there was no due diligence team per se at Gabriel Capital Corporation that ever did formal due diligence on Mr. Madoff, true?

A.    We had no formal due diligence team doing work on Madoff."

(Jesselson Tr. 1718) (emph. added).  See also Wiederhorn Tr. 131-133 (per Merkin's own testimony, neither GCC nor Merkin ever performed "formal due diligence on … Bernard L. Madoff Investment Securities") (emph. added); Weiss Tr. at 1125-1128 (wherein Autera

affirmatively *denies* that his role – inputting the trade confirmations and creating management information systems for Merkin – constituted due diligence).

76.      Autera also testified that he visited the Madoff firm only twice in 18 years --- in the early 1990s and next in November 2008 (Weiss Tr. 1124); that he never even considered the question of how Madoff allegedly had such exquisite market-timing ability (*id.* at 1138); and that he does not recall any conversations with Merkin on that subject (*id.* at 1141).   Nor did Autera ever even focus on the differences in the capacity codes listed in the Madoff transaction confirmations.   (Jesselson Tr. 1725)   In addition, no other Merkin or GCC employee even accompanied Merkin and Autera to the meeting with Madoff and UBPAM in November, 2008 (Jesselson Tr. 1712-1713)   Hence, nobody associated with Merkin or GCC did any actual "due" diligence on the Madoff strategy, operations, personnel or auditor.

77.      Moreover, unlike Merkin's colleague Sandra Manske, Merkin never disclosed to actual or prospective investors that substantially all Ascot assets were housed and managed by a single, small, broker-dealer; that such broker-dealer used a strategy which is "not well-followed by the Wall Street community"; that "[a]ccordingly, there is very little independent data available to assist a prospective investor in his analysis of the Fund"; and that "the information supplied by the Investment Advisor may be inaccurate or even fraudulent" but that the "Co-Managers are entitled to rely on such information … and are *not* required to undertake any due diligence to confirm the accuracy thereof."   (Kingate Global Fund, Ltd. Information Mem., dated May 1, 2000, itals. added)[7]

---

[7]   In May 2001, the hedge fund industry publication MAR/Hedge published an expose on Madoff which openly questioned how Madoff, for at least 12 consecutive years since 1989, had obtained such consistently positive quarterly results using a routine collared equity which could only work if, after establishing the positions, the broad stock market rose.   The article noted that no other money manager had anywhere near the same level of success using the same strategy.   The article also stated that Madoff claimed to employ OTC options almost exclusively, whereas Merkin claimed, in his offering memoranda,

78.     Merkin has known Madoff for 40 years or more.   No wonder Madoff wrote a Pulitzer prize-finalist New York Times reporter from prison to say that, unlike virtually every other bank, broker or asset manager who relied so heavily on Madoff: "Ezra Merkin is one of the brightest and [most] wonderful people I have ever known.   He is an honorable man." Henriques, Diana B., The Wizard of Lies (Times Books 2011) at 114.   Over the years of the protracted bear market of 2000 through 2002 (the tech wreck, 9/11, a recession and numerous corporate scandals), no Merkin hedge fund lost money and, in general, they reported annual gains of 8%-10% or more. This experience seemed to validate Merkin's supposedly cautious, diligence-centered approach.

### Claims for Relief

### FIRST CLAIM FOR RELIEF
(for breach of fiduciary duty against both defendants)[8]

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     Plaintiff entrusted assets to GCC and then to Merkin directly by purchasing and retaining shares in Ascot Fund for many years and reposed confidence in Merkin with

---

that if his funds bought options, they did so over a "registered options exchange."   The threat of fraud in the reporting of trades allegedly conducted over a registered options market (the CBOE) is virtually non-existent.   The threat of fraud in the reporting of trades allegedly conducted in the private, "upstairs," or, OTC market is much greater (there is no public clearinghouse, watchdog or accountability).   By falsely claiming that options trading, if any, by Ariel, would take place "on a registered options exchange" (December 2002 Ascot offering memorandum), Merkin engaged in fraud, on a matter which directly contributed to the damages complained of herein.   In addition, having entrusted as much as $2.4 billion to him, Merkin, an unquestionable fiduciary, breached his fiduciary duties by failing to conduct even a cursory analysis of where and how Madoff allegedly conducted his options trading or of how Madoff's purported options execution, even in this market of highly sophisticated firms many times the size of Madoff, "got great."   (Exhibit C hereto at 127)

[8] Merkin and GCC are estopped to contend that plaintiff's mismanagement claims are derivative because it is owing to Merkin's own conduct that KM has been precluded from participating in the NYAG/Merkin settlement, i.e., a settlement which purports to encompass and resolve the fund mismanagement claims brought against Merkin by the receivers of Ascot, Gabriel, and Ariel.

respect to the management of those assets. The superior position of Merkin and GCC in the management and control of those assets, as well as their superior access to confidential information about the investment of those assets and about Madoff, required plaintiff to place trust and confidence in Merkin and GCC who had full managerial and administrative responsibility and overall control of Ascot Fund. Merkin also held himself out as providing superior client investment services and as having put in place appropriate policies, procedures and controls governing investments so as to reasonably ensure the safety of the plaintiff's assets and that the transactions relating thereto would be properly conducted.

81.     Merkin and GCC expressly acknowledged their superior position and accepted the trust and confidence bestowed upon them by investors in Ascot Fund including plaintiff. Specifically, in his Confidential Offering Memorandum dated October 2006, relating to Ascot, Merkin and his affiliates expressly agree to "undertake" to resolve any conflicts-of-interest between or among the various funds under Merkin's management and Merkin's other time commitments and business activities "in a manner that is consistent with their respective *fiduciary duties* to the Fund." See also April 18, 2000 letter to investors in Gabriel and Ariel ("The incentives in money management, unfortunately, are often skewed toward undue risk-taking, because managers are rewarded -- in fees and through attracting new investors – for outsized returns more than they are punished for negative results. Tempering this tendency, we would hope, is a sense of *fiduciary* responsibility."). Merkin also has acknowledged that he was obligated to conduct his "oversight" obligations at his hedge funds, including his oversight of Madoff, in a "fiduciary" manner. In the Matter of Madoff Charities Investigation, Transcript of January 30, 2009 Examination under Oath of J. Ezra Merkin, Exhibit C hereto, at 101 ("... *I had fiduciary responsibilities for the oversight of the portfolio*, and we were entrusting, we were

giving money to Bernie because we *believed* in the combination of his executions and his calls")
(itals. added).

82.     Merkin and GCC therefore owed fiduciary duties to Ascot Fund's investors
including plaintiff. These investors reasonably and foreseeably relied on the representations of
Merkin and trusted in his professed expertise and skill. Merkin therefore owed a fiduciary duty
to plaintiff with respect to the management and protection of the assets held in Ascot Fund.

83.     Merkin and GCC were obligated to deal fairly and honestly with all investors
in their hedge funds including plaintiff; to act loyally and in good faith toward all such investors;
to avoid placing themselves in situations involving a conflict of interest with such investors (or,
alternately, to disclose fully such conflict of interest so that investors could make a fully
informed decision whether to retain their investments in the Fund); to use that level of care in the
handling of the assets of the Fund expected of fiduciaries; and to oversee the investment of the
assets of the Fund, with the skill and effort required, to confirm that the assets were being
invested and maintained in a prudent and professional manner.

84.     Merkin also became a fiduciary of plaintiff KM by reason of the long history
of friendship and affinity that existed between and among the Merkin and Jesselson families. In
addition, Ezra Merkin and Benjamin Jesselson became friends and they invited one another to
family celebrations such as bar mitzvahs.

85.     Merkin also held himself out as a great philanthropist and supporter of the
Jewish community, in New York and in Israel, through the presidency of his prestigious
synagogue, and his investment committee chairmanships of various Jewish non-profit
institutions (such as UJA/Federation, Ramaz and YU), so that his ethics, fees and solicitation
efforts would not be questioned. In a word, Merkin engaged in quintessential affinity fraud.

86.     Merkin and GCC thus breached fiduciary duties to plaintiff KM, and acted in reckless disregard of those duties, *inter alia* by the following:

a.     by failing to act with due and reasonable care in ascertaining that the information set forth in written materials provided to investors was accurate and complete and did not contain any misleading statements or material omissions of material fact;

b.     by failing to perform adequate due diligence on Madoff, at any time between 1990 and 2008, in light of (1) the concerns of the Madoff "skeptics" (Merkin's term), articulated well prior to 2008, including those of Victor Teicher, Jack Nash, Joshua Nash, Noreen Harrington, Peter Stamos, Merrill Lynch, the unnamed sources in the May 2001 MAR/Hedge article, and numerous others and (2) Madoff's Forms ADV, as filed with the SEC annually in 2006, 2007 and 2008, which Merkin either knew or should have immediately comprehended were false and fraudulent and could subject Madoff to criminal prosecution at any time;

c.     by failing to perform any testing or analytical work on the account statements and transaction confirmations received from Madoff, to see if they made any sense or conformed to the "Trading Authorization Directive" disseminated by Madoff in November 2002;

d.     by failing to demand of Madoff, on a test basis, the names and contact information of Madoff's alleged OTC option counter-parties, so that Merkin could make a direct investigation to determine whether this purported options and hedging activity, relating to $2.4 billion of assets under management, was real (a step that any prudent manager and fiduciary would take in the circumstances, having entrusted approximately $2.4 billion in assets to Madoff);

e.     by failing to document any due diligence investigation of Madoff;

f.      by falsely claiming that, in selecting any third party investment managers, defendants were capable of conducting, and would conduct, a reasonable investigation;

g.      by failing to disclose that, overwhelmingly, Merkin was a mere intermediary who left the task of making actual investment decisions entirely to others;

h.      by failing to disclose that investors were being exposed to Madoff, and to the uncertainties relating to Madoff, in both Ascot and in Ariel/Gabriel, vastly but secretly multiplying and exacerbating the risks;

i.      by reason of his commitments to various other funds (including Amber Fund Limited), managed accounts, and his other business activities (including, without limitation, his chairmanship of numerous investment committees, trusteeships, and his commitments as Chairman of GMAC), failing to devote the time and effort required to evaluate the Madoff strategy, the inherent risk that any investment manager may be conducting a Ponzi scheme (general fraud risk), and/or the specific risks that Madoff may be conducting a Ponzi scheme (as outlined in the May 2001 MAR/Hedge article); and

j.      by profiting enormously through the relationship with Madoff, to the extent of tens of millions of dollars per year, including management fees and purported incentive allocations, without disclosing the conflict-of-interest.

87.     The sum total of the "diligence" notations made by Merkin and GCC and retained in Merkin's Madoff "diligence" file, and Madoff's 2002 Trading Authorization Directive, are reproduced hereto as **Exhibit J**. This meager file, in and of itself, compels the conclusions that Merkin did not even attempt to perform any kind of systematic due diligence on Madoff, and thus, in and of itself, demonstrates that Merkin violated his fiduciary duties to plaintiffs.

88.     As a result of these breaches of fiduciary duty by Merkin and GCC, plaintiff has been damaged in an exact amount to be proven at trial.  KM's out-of-pocket losses are at least $1.5 million.

## SECOND CLAIM FOR RELIEF
(for common law fraud and deceit against both defendants)

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     As specified more fully below, Merkin and GCC made numerous representations and omissions of material fact to plaintiff, partial statements, misleading comments, and half-truths, in offerings materials, in oral statements made both before and after the subject investments, in quarterly letters and in year-end financial statements.

91.     In and after 2000, Benjamin Jesselson visited Merkin and GCC's offices and trading areas, at 450 Park Avenue, New York, New York.  Merkin also met with some frequency with Jesselson at 450 Park Avenue and in Israel after their initial meeting.  In these meetings, Merkin deliberately conveyed the impression, in words or substance, that, except for certain transactions sourced by Cerberus Capital Management, he *personally managed* the entire portfolios of Ascot, Ariel Fund and Gabriel.  He never once even suggested that, overwhelmingly, he was just a financial intermediary who entrusted billions of dollars to other money managers to make the difficult decisions of whether to invest in a given security and, if so, on what terms and conditions and in what amounts.

92.     Moreover, Merkin never explained that the bulk of the persons working in his office at 450 Park Avenue, 32nd Floor, including David Sherman and his employees at Cohanzick, and Jack Mayer, were not *Merkin's* employees, but were independent contractors

who exercised complete discretion on the small percentage of Gabriel and Ariel capital which had been entrusted to them.

93.     Plaintiff relied upon these representations, omission, and false impressions created by Merkin, both in making and in retaining the subject investments.

94.     In addition, in selling the subject shares to plaintiff, Merkin and GCC made numerous affirmative misrepresentations of material fact in their offering materials.

95.     Defendants made these affirmative representations of material fact knowing them to be untrue or in reckless disregard for the truth, and with the intent that plaintiff KM, as a prospective and actual investor, would rely upon them.

96.     Not knowing the truth, plaintiff did rely upon them, to its detriment and injury.

97.     Plaintiff's reliance was reasonable and justifiable in the circumstances.

98.     Defendants' material misrepresentations in the offering materials included the following:

> KM of $1,000,000 in Ascot Fund, October 1, 2002
> (February 1996 Prospectus, Exhibit B hereto)

a.     that Ascot "engages primarily" in three forms of "arbitrage" investing, namely, "index arbitrage, convertible arbitrage and options arbitrage" (page 4);

b.     that these strategies "are used to take advantage of price disparities among related securities" (page 4);

c.     that "The Fund has hired the Investment Advisor [the "IA"] to implement the Fund's policies and objectives" (page 4);

d.     that the IA "may often employ strategies involving derivative securities like options, futures and convertibles" (page 4);

e.      that even if assets of Ascot are placed with other money managers, the IA "will retain overall investment responsibility for the portfolio of the Fund," page 5, a statement which, at a bare minimum, necessarily implies that defendants would perform comprehensive due diligence on any third party money managers entrusted with Ascot's assets;

f.      that "[t]he success of the Fund depends to a great extent upon [the IA]" and, I in the same paragraph, that the death or incapacity of Merkin, owner of all outstanding shares of the IA, would result in the redemption of all outstanding Participating Shares" (page 5);

g.      that any options transactions for Ascot's account would be executed over a registered options exchange (page 6);

h.      that the IA "will exercise reasonable care in selecting" any independent money managers (page 9);

i.      that the IA "*may* not have custody over the funds" if they are entrusted to independent money managers (page 9, itals. added); and

j.      that the IA "selects brokers to effect transactions for the Fund," that such brokers are paid for "clearing and settling functions" [!]; and that such brokers "will *not* perform managerial or policy-making functions for the Fund" (page 13, itals. added).

KM Investment of $500,000 in Ascot Fund, January 1, 2004
(December 2002 Prospectus)

a.      that Ascot "engages primarily" in three forms of "arbitrage" investing, namely, "index arbitrage, convertible arbitrage and options arbitrage";

b.      that these strategies "are used to take advantage of price disparities among related securities";

c.     that Merkin, as "Managing Partner" of Ascot, "intends ... to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions he can follow more closely";

d.     that Merkin "uses hedging devices frequently and engages in short sales";

e.     that even if assets of Ascot are placed with other money managers, defendants "will retain overall investment responsibility for the portfolio of the Partnership," a statement which, at a bare minimum, necessarily implies that defendants would perform comprehensive due diligence on any third party money managers entrusted with Ascot's assets;

f.     that "all decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin. Consequently, the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin";

g.     that Merkin "will devote his best efforts to the management of the Partnership's portfolio";

h.     that Merkin would "exercise reasonable care" in the selection of any third party or independent money managers to manage money for Ascot; and

i.     that any options transactions for Ascot's account would be executed over a registered options exchange.

99.     Defendants committed fraud in some cases by making partial and misleading disclosures and/or disclosing only half the truth. Under New York law, while defendants could have elected to make no disclosures at all concerning their investment strategy, once they elected to disclose their alleged strategies, they had to do so accurately, fully and fairly. The fact that Merkin was free, after receiving investor subscriptions, to *change* his strategies, even entirely, is of no moment because investors make investment decisions, at large part, on the basis of

*historical* performance and where, as here, Ascot has a long history of reported success, using its disclosed strategies of engaging in options, index and convertible arbitrage, in which the manager professes to have great expertise, there is little if any reason for a prospective investor to believe that the manager would actually make any major changes in his investment approach.

100.    In addition, under applicable law, an investor is presumed to have relied upon an omission if the omitted information is material.  As set forth above, in offering the subject investments in Ascot Fund to plaintiff, defendants failed to disclose the following material information: (A) the fact that 98%, or more, of Ascot's investment assets were not invested by Merkin but were simply transferred to Madoff; (B) that Madoff did not permit actual or prospective investors to perform an acid-test due diligence, that was required in the circumstances, including obtaining direct confirmation of reported trades from Madoff's alleged options counter-parties; (C) that Merkin knew that Madoff did not permit actual or prospective investors to perform an acid-test due diligence, that was required in the circumstances, including obtaining direct confirmation of reported trades from Madoff's alleged options counter-parties; (D) that, in 18 plus years (1990-2008), Merkin had never even attempted to perform any due diligence on Madoff other than in November, 2008, the month before Madoff was arrested; (E) that, until December 11, 2008, Merkin had no real idea as to how Madoff so consistently and without misstep achieved his results and that therefore there was a real risk Madoff might be engaged in a Ponzi Scheme; (F) that Gabriel and Ariel were overwhelmingly funds-of-funds and hence that Merkin was not a real *asset manager* at all, in *any* fund; (G) that, to the end, Merkin believed that Madoff was executing some 20-25% of the Ascot's options transactions on the CBOE (Exhibit C hereto at 134-137), but that the contemporaneous market data published by CBOE demonstrated that that could not have been true (a discrepancy never investigated by

Merkin) (see **Exhibit K** hereto); (H) that, even in 2001, Madoff informed MAR/Hedge that he executed virtually all his options transactions over-the-counter (OTC) and *not* on the CBOE (a discrepancy never investigated by Merkin); (I) that the strategy purportedly used by Madoff only worked if Madoff could properly predict when the broad equity market was about to rise, i.e., it was not an "arbitrage" strategy designed "to take advantage of price disparities among related securities"; (J) that no asset manager in history has been able to concoct a device which can predict with any degree of certainty when the broad equity indices are about to rise; (K) that by investing in both Ascot and Gabriel/Ariel, an investor would be materially exposed to Madoff not once but twice, ostensibly through funds which were supposed to be engaged in *different*, alternative, investment strategies; (L) that Merkin's overwhelming dependency on Madoff going back to the early 1990s rendered Merkin essentially incapable of doing any objective, independent, due diligence on Madoff or even of asking Madoff any hard questions and (M) that, since at least November 2003, Merkin managed another hedge fund, Amber Fund Ltd., which had exposures and investments essentially identical to those of Ariel and Gabriel, but without any exposure to Madoff at all, demonstrating Merkin's *actual, subjective, awareness* of the suspicions held by many concerning Madoff and his public explanations for his uninterrupted success.

101.    Defendants also committed fraud, inducing KM to retain and, in 2004, to augment its investment with Merkin, by issuing a stream of quarterly letters to investors which painted a completely misleading picture of Merkin as a manager who was concerned, above all, with *preservation of principal*, *safety of investments*, *painstaking* research, and "play[ing] *defense, defense, defense*." (April 20, 2007 letter to investors at 5-7) See also July, 1999 GCG marketing piece, "What We Bring to the Table" ("Denied clairvoyance, I have tried to substitute

*care*."); October 17, 2003 letter at 4 ("Tragedy is, well, tragedy: blowing up, losing the capital, getting mauled by the white tiger. *Our first job is capital preservation....*"); January 20, 2008 letter to investors at 9 ("The combination of some talent and *a lot of diligence* got us through a rocky 2007, and we hope to employ the same formula good if not better effect in calmer years ahead"); July 21, 2008 letter at 7 ("As always, *we remain focused on preserving principal* and committed to managing risk"). (itals. added)

102.    In the Wiederhorn arbitration, a majority of the arbitral panel found that, by failing to disclose Ascot's complete reliance on a single outside money manager, Merkin violated his disclosure obligations owed to investors in Ascot. The Wiederhorn panel also found that Merkin committed these breaches of duty with scienter. (Exhibit A hereto) The Wiederhorn arbitration was tried to three (3) highly experienced litigators, each of whom is a senior partner at his firm. All witnesses were placed under oath and the hearing was conducted over seven days, under trial-like conditions. Both sides filed extensive pleadings, a pre-hearing memorandum of law, a post-hearing memorandum of law, a post-hearing reply brief and a form of proposed award. Both parties also filed a supplemental evidentiary brief (dated April 7, 2010) requested by the panel chair. Each party propounded document demands and exchanged discovery before the hearing. Dr. Wiederhorn, as claimant, subpoenaed three fact witnesses. In addition, each side issued extensive expert reports and called a number of experts to the stand. In short, Merkin defended the Wiederhorn arbitration highly aggressively, expending even more in the defense of the case than Dr. Wiederhorn had invested with Merkin. Merkin is collaterally estopped to deny the Wiederhorn panel's finding that Merkin breached his disclosure obligations to investors in Ascot.

103.     As a result of the foregoing, plaintiff has been damaged in an exact amount to be proven at trial.  KM's out-of-pocket losses are at least $1.5 million.

### THIRD CLAIM FOR RELIEF
(for breach of implied obligation of good faith and fair dealing against both defendants)

104.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

105.     In order to make an investment in Ascot Fund, prospective investors were required to review and execute a subscription agreement.  That agreement incorporated certain documents, including the offering memorandum of the fund, a memorandum of association, and certain articles of association.  Upon proper execution of the forms (which were non-negotiable), defendants accepted the capital contributed by investors and the contractual commitments of the investment advisor made in the offering documents, including, *inter alia*, the commitment to devote as much time and effort to the management of the Funds as the investment advisor deemed necessary and appropriate.

106.     The foregoing obligation – to devote as much time and effort to the management of the Fund as was "necessary and appropriate" – is subject to the implied covenant of good faith and fair dealing contained in all contracts as a matter of law.

107.     Merkin, GCC, and/or entities which functioned as mere instrumentalities under Merkin's domination and control, breached their implied obligation of good faith and fair dealing in the management of Ascot Fund, notably by failing to conduct adequate due diligence on Madoff and/or by failing to warn actual or prospective investors in Ascot Fund that Madoff did not permit the kind of due diligence that was required to assess the known risks of Madoff's claimed strategy.

108.     As a result of the foregoing, plaintiff has been damaged in an exact amount to be proven at trial.  KM's out-of-pocket losses are at least $1.5 million.

### FOURTH CLAIM FOR RELIEF
(for gross negligence against Merkin and GCC)

109.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.     As specified above, as a professional money manager and advisor, each of Merkin and GCC assumed the obligations by law to use at least ordinary care in the management of Ascot Fund and, in particular, in the conduct of due diligence on any third-party money managers they employed.

111.     As set forth above, in breach of duties owed to plaintiff, defendants failed to use even minimal care in the management of Ascot Fund and, in particular, in the conduct of due diligence on Madoff.   Instead, defendants' due diligence of Madoff was, at a minimum, grossly negligent, in view of, *inter alia*, the following facts:

a.     that Madoff admitted to long-time cronies, such as Leon Meyers, a close confidant of Merkin's, that Madoff required 24-hour non-cancellable orders from his large brokerage firm clients and that Madoff used these orders to the advantage of his advisory clients (**Exhibit L** hereto);

b.     that Merkin admitted, in an April 22, 2004 letter to investors, that "[i]t is possible to have transparency without understanding" (Exhibit M hereto);

c.     that, with respect to Madoff's purported investment strategy, Merkin, in fact, had seeming "transparency" (in the form of paper confirmations delivered days or, sometimes,

weeks, after the purported trades) but had no "understanding" of how Madoff actually achieved his stated results (see **Exhibit M** hereto);

      d.      that Merkin knew that he had no real idea of how Madoff had so consistently reported positive results since 1980 (see Exhibit M hereto); that Madoff did not permit Merkin (or anyone else) to perform any "acid test" due diligence (which was required after the May 2001 MAR/Hedge expose); and that Merkin was therefore left having to seriously misrepresent how Ascot was operated in order to raise money from more sophisticated market participants;

      e.      that there was no good reason for Madoff to permit the outside operators, such as Merkin, of Madoff's massive network of feeder funds to pocket hundreds of millions of dollars per year in supposed management fees and performance incentives when those outside operatives played no actual role in the management of the assets whatsoever; and

      f.      Madoff's Form ADV, dated January 7, 2008, wherein Madoff states, under penalties of perjury, that Madoff Securities had "$17,091,640,696.00" in assets under management, ostensibly held in just "23" accounts (response to Item F(2)), and, upon information and belief, earlier iterations of Madoff's Form ADV (dating from 2006) containing similar, palpably false, assertions concerning the tiny number of accounts Madoff supposedly managed.

      112.      The foregoing conduct and omissions were a substantial factor in plaintiff's losses.

      113.      As a result of the foregoing, plaintiff has been damaged in an exact amount to be proven at trial. KM's out-of-pocket losses are at least $1.5 million.

## FIFTH CLAIM FOR RELIEF
(for unjust enrichment against Merkin and GCC)

114.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.     As specified above, plaintiff, by investing, insofar as is relevant to this action, $1.5 million with defendants, conferred a substantial benefit upon defendants, because it enabled defendants to extract a percentage of the capital contributed, as a "annual management fee," whether Ascot made a profit or not, without have to expend any substantial effort to take any material risk.

116.     As stated above, defendants did not provide investment management services of the kind described in the fund management documents and/or in accordance with industry standards.

117.     The essence of unjust enrichment is that one party has received money or benefit at the expense of another under circumstances where it would be "against equity and good conscience" to permit the other party to retain what is sought to be recovered.

118.     It would be unconscionable to permit the defendants to retain the amounts invested by plaintiffs in Ascot or any portion thereof.

119.     Equity and good conscience require that all management fees, and any other fees or consideration that flowed from the subject investments to defendants, be disgorged and refunded to plaintiff, plus interest.

## REQUEST FOR PUNITIVE DAMAGES

In addition, as alleged above, defendants' behavior was directed to the public generally, including many non-profit entities besides plaintiff KM, and was intentional, deliberate, malicious, aggravated, and/or an extreme and indefensible departure from ordinary care. Therefore, by this action, in addition to full compensatory awards, including pre-judgment

interest, plaintiff seeks punitive damages of at least $5.0 million from Merkin.   Any punitive damages awarded, in excess of costs and fees, will be donated to charities in accordance with plaintiff KM's usual polices.   In view of the purely charitable nature of the plaintiff's activities, undersigned counsel for plaintiff has agreed to limit his contingent fee, if any, to 20% of the amount by which the final determination of this matter *exceeds* the value of the NYAG/Merkin settlement (in each case, as expressed in nominal, i.e., not discounted, dollars) or to such other amount as may hereafter be agreed to in writing by plaintiff, Merkin and the undersigned.

## REQUESTS FOR RELIEF

Plaintiff Keren Matana therefore respectfully request judgment against the defendants, and against each of them, jointly and severally, as follows:

(a)      On the 1st through 4th claims for relief, alleged above, at least $1.5 million;

(b)      On the 5th claim of relief, for the disgorgement of fees;

(c)      punitive damages of at least $5 million;

(d)      on all claims for relief, the costs and disbursements of suit;

(e)      pre- and post-judgment interest at the statutory rate;

(f)      reasonable attorneys' fees; and

(f)      any and all additional or other relief to which plaintiff is entitled.

## JURY DEMAND

Plaintiff respectfully requests that this civil action be tried to a jury.

Dated:      New York, New York
             March 7, 2013

Respectfully submitted,

**BRICKMAN, LREONARD & BAMBERGER PC**

By: _David E. Bamberger (DB1285)_

317 Madison Avenue, 21st Floor
New York, New York 10017
(212) 986-6840 (telephone)
(212) 986-7691 (facsimile)
David.bamberger@brickmanlaw.com

Attorneys for Plaintiff Keren Matana