UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                           :

KEREN MATANA,                                :

                              Plaintiff,     :            13 Civ. 1534 (PAE)

                                      :       OPINION & ORDER

                  -v-                   :

                                      :

J. EZRA MERKIN and GABRIEL CAPITAL     :
CORPORATION,                            :

                                      :

                           Defendants.    :

                                      :
-----------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiff Keren Matana ("KM") brings this action against defendants J. Ezra Merkin and

Gabriel Capital Corporation ("GCC") (collectively, "defendants").  KM invested $1.5 million in

Ascot Fund Limited ("Ascot Fund"), an off-shore hedge fund managed by Merkin and GCC.

Ascot Fund, in turn, invested substantially all of its assets with Bernard Madoff.  KM's

investment was wiped out following the revelation that Madoff was operating a massive Ponzi

scheme.  KM now brings state law claims of fraud, breach of fiduciary duty, breach of the duty

of good faith and fair dealing, gross negligence, and unjust enrichment.

       Presently before the Court are two motions.  Defendants move to dismiss the Complaint,

and KM moves to strike several documents relied on by defendants in support of their motion.

For the reasons stated, defendants' motion is granted, and KM's motion is granted in part and

denied in part.

I.      **Background**[1]

    A.      **The Parties and Relevant Entities**

KM is a not-for-profit organization formed under the laws of the state of Israel.  Compl. ¶¶ 1, 25.  GCC, formerly known as Ariel Management Corporation, is a Delaware corporation.  *Id.* ¶¶ 1, 31.  At all relevant times, Merkin owned 100% of the capital stock of GCC and exercised control over its operations and over the investment funds that GCC advised, including Ascot Fund.  *Id.*  GCC also advised Gabriel Capital L.P. ("Gabriel Fund"), a Delaware limited partnership, and Ariel Fund Limited ("Ariel Fund"), an off-shore entity that made parallel investments to Gabriel Fund.  *Id.* ¶¶ 16, 51.  Gabriel Fund and Ariel Fund also had significant exposure to Madoff.  *Id.* ¶ 20.

Ascot Fund—the relevant entity here—is an off-shore hedge fund based in the Cayman Islands.  It originally made parallel investments to those of Ascot Partners, L.P. ("Ascot Partners"), a domestic limited partnership, of which Merkin was the general partner.  *Id.* ¶¶ 7, 14.  According to its February 1996 Prospectus, Ascot Fund was engaged in three different market-neutral arbitrage strategies designed to take advantage of price discrepancies among related securities.  *Id.* ¶ 14 (citing 1996 Prospectus, at 1).  The Complaint alleges, however, that this was untrue:  Ascot Fund actually had a single strategy of entrusting all of its assets to Madoff, who

---

[1] The Court's account of the facts is drawn from the Complaint (Dkt. 1), and those documents appropriately considered on a motion to dismiss, which include:  Ascot Fund's February 1996 Prospectus (the "1996 Prospectus"), which is attached as Exhibit B to the Complaint; Ascot Fund's January 2003 Prospectus (the "2003 Prospectus"), which is attached as Exhibit 2 to the Declaration of Daphne Ha in Support of Defendants' Motion to Dismiss the Complaint (Dkt. 14) ("Ha Decl."); a December 2002 Offering Memorandum (the "2002 Offering Memorandum"), upon which KM relies in the Complaint and which is attached as Exhibit A to the Declaration of David Bamberger in Opposition to Defendants' Motion to Dismiss the Complaint (Dkt. 21) ("Bamberger Decl."); and the subscription applications KM executed for the Ascot Fund, which are attached as Exhibits B and E to the Declaration of David Bamberger in Support of Plaintiff's Motion to Strike Exhibits (Dkt. 17) ("Bamberger MTS Decl.").  The basis for consideration of these documents on this motion is set forth below.  *See infra*, Part III(A).

acted as the sole broker, manager, and custodian of Ascot Fund's assets. *Id.* ¶ 14. The Complaint alleges that Madoff had been managing 98-100% of Ascot Fund's assets since 2001, and had been managing at least 88% of Ascot Fund's assets since 1992. *Id.* Ascot Fund was formed "solely to batch the accounts which [Merkin] had introduced to Madoff and to continue to charge [a] 1% [management] fee on them." *Id.* ¶ 48. On January 1, 2003, Ascot Fund was reorganized into a "master-feeder" structure, whereby it would simply invest all of its assets in Ascot Partners. *Id.* ¶ 18; *see also* 2003 Prospectus, at 1, 4.

**B.     KM's Investments**

On October 1, 2002, KM invested $1 million in Ascot Fund. Compl. ¶ 26. The Complaint alleges that KM made this investment based on Ascot Fund's offering materials—specifically the 1996 Prospectus, *see id.* Ex. B. On January 1, 2004, KM invested another $500,000 in Ascot Fund. *Id.* ¶ 27. The Complaint alleges that this investment was based on a December 2002 Offering Memorandum. *Id.*[2] The Complaint alleges that KM also made these investments based on Merkin's reputation and oral representations, and the performance history of Merkin's funds. *Id.* ¶¶ 26–27.

After Madoff's fraud was exposed, the value of Ascot Partners', and thus Ascot Fund's, investments with Madoff was wiped out; KM lost $1.5 million. *Id.* ¶ 19.

**C.     Alleged Misrepresentations**

The Complaint alleges that Merkin and GCC made numerous misrepresentations to their investors. These included misrepresenting the strategies that outside money managers might pursue and failing to exercise sufficient care in selecting those managers (*i.e.*, Madoff). *Id.* ¶¶

---

[2] The 2002 Offering Memorandum was not attached to the Complaint. It was eventually submitted to the Court, *see* Bamberger MTS Decl. Ex. A, but it appears to apply only to Ascot Partners, not Ascot Fund. In any event, the 2002 Offering Memorandum is substantially identical to the 2003 Prospectus which does apply to Ascot Fund. *See infra*, Part III(A).

17, 98(a)-(e), (h).  The Complaint further alleges that Merkin and GCC falsely represented that the success of Ascot Fund was dependent on Merkin and his expertise, *see id.* ¶¶ 50, 98(f), when in fact Merkin was simply funneling investors' money to Madoff to invest, *see id.* ¶¶ 20, 58–59, 77.  Merkin also allegedly falsely represented that transactions for Ascot Fund accounts would be executed over a registered options exchange.  *Id.* ¶ 98(g), (i).

Although Merkin represented that he would perform due diligence on any outside managers with whom he invested, the Complaint alleges that Merkin did not do so.  *Id.* ¶¶ 17, 21.  Rather, it alleges that Merkin knew that Madoff did not permit investors to perform due diligence, *id.*, rebuffed potential investors who sought to inquire about Madoff's operation, *id.* ¶ 72, and lacked a formal due diligence team, *id.* ¶¶ 74–75.  These failings were especially egregious, the Complaint alleges, in light of the fact that Merkin was a "fund-of-funds" manager.  Merkin therefore added little value to his investors other than by performing due diligence on the funds in which he invested.  *Id.* ¶ 59.

The Complaint alleges that Merkin was warned about Madoff, *id.* ¶ 60, that other investors were suspicious of Madoff's performance, *id.* ¶¶ 64–65, and that Merkin ignored numerous red flags that should have alerted him to Madoff's fraud, *id.* ¶ 66.  These red flags included: (1) that Madoff acted as his own custodian of securities; (2) that he did not charge management fees or performance incentives; (3) that he refused to explain his strategy in any detail; (4) that he had a track record so successful as to be unprecedented; (5) that he used a tiny auditing firm; (6) that he relied on private, over-the-counter options; and many others.  *See id.*

In sum, the Complaint alleges numerous material misrepresentations in Ascot Fund's February 1996 Prospectus, *see id.* ¶ 98(a)–(j); numerous material misrepresentations made in the December 2002 Offering Memorandum, *see id.* ¶ 98(a)–(i); and numerous material omissions in

these offering memoranda, *see id.* ¶¶ 99, 100(A)–(M).  Additionally, the Complaint alleges that defendants induced KM to retain its investments in Ascot Fund by sending a "stream of quarterly letters to investors which painted a completely misleading picture of Merkin as a manager."  *Id.* ¶ 101.  The letters referenced by KM were dated July 1999; October 17, 2003; April 20, 2007; January 20, 2008; and July 21, 2008.  *Id.*

### D.     Ascot Fund's Disclaimers

The offering materials provided to KM included certain disclaimers and cautionary language.  For instance, the 1996 Prospectus cautioned that GCC "may delegate investment discretion for all or a portion of the assets of the Fund to money managers, other than [GCC]. . . . Although [GCC] will exercise reasonable care in selecting such independent money managers . . . [GCC] may not have custody over the funds invested with other money managers."  1996 Prospectus, at 9; *accord* 2002 Offering Memorandum, at 6; 2003 Prospectus, at 7.  The 1996 Prospectus warned that GCC could engage outside managers "without prior notice to or consent of the shareholders" and that "[t]he success of the Fund is also dependent upon any investment advisors to Other Investment Entities."  1996 Prospectus, at 5; *accord* 2002 Offering Memorandum, at 5, 6; 2003 Prospectus, at 5.

### E.     Related Litigation

Two separate lawsuits—one brought by the New York Attorney General ("NYAG"), the other an investor class action—are relevant to this motion.  As explained below, KM invokes both lawsuits in the course of arguing that the statute of limitations governing its claims was tolled and has not expired.  The Court, accordingly, briefly summarizes those lawsuits here.

***The NYAG's Martin Act Lawsuit***:  The NYAG's lawsuit was brought in April 2009 under the Martin Act against Merkin and GCC, on behalf of investors in Merkin's funds,

including Ascot Fund.  Compl. ¶ 12; *see also People v. Merkin*, 907 N.Y.S.2d 439 (1st Dep't

2010) (denying defendants' motion to dismiss).  The NYAG has reached a settlement with the

defendants in that litigation.  Compl. ¶ 12.  However, the Complaint alleges that, under that

settlement agreement, Merkin retains the discretion to prevent parties from participating in the

settlement under certain circumstances.[3]  *Id.*  The Complaint alleges that Merkin has exercised

that discretion here to exclude KM from that settlement, *see id.*, because of the actions of

Benjamin Jesselson, one of the principals of KM, *see id.* ¶¶ 1, 25.  Jesselson, whose family had a

history of friendship with the Merkin family, *see id.* ¶¶ 34–40, 84, had invested money from

family trusts in both Ascot Partners and Gabriel Fund; those investments were also wiped out.

*Id.* ¶¶ 11–12.  Unlike KM, however, Jesselson had a contractual right to arbitrate disputes

relating to his investments.  Jesselson brought claims against Merkin and GCC pursuant to that

arbitration agreement, and won a $1.5 million award (the "Weiderhorn Award").  *Id.* ¶ 12.  The

Complaint alleges that Merkin's counsel has advised KM that KM will not be permitted to

participate in the NYAG settlement unless Jesselson waives his right to collect on the $1.5

million Weiderhorn Award.  *Id.*

  **The Investor Class Action**:  The investor class action is currently pending in federal

court against Merkin, GCC, and other defendants, asserting federal securities claims and state

common law claims.  *See In re J. Ezra Merkin*, No. 08 Civ. 10922 (DAB).  That action was

brought on behalf of all investors in Ascot Partners, Gabriel Fund, and Ariel Fund, but, notably,

not on behalf of investors in Ascot Fund.  *See* No. 08 Civ. 10922 (DAB), Dkt. 98 (Fourth

---

[3] At argument, counsel for defendants represented that investors had the option to either
participate in the NYAG settlement, or separately litigate their claims.  *See* Tr. 4–7.

Consolidated Amended Class Action Complaint), ¶¶ 1–2, 32–35.[4]  The district court originally dismissed all federal and state claims in that action.  *See In re Merkin*, 817 F. Supp. 2d 346 (S.D.N.Y. 2011).  However, the dismissal of some of the plaintiffs' state law claims was based on Martin Act preemption.  Plaintiffs moved to reconsider that decision, and after the New York Court of Appeals subsequently issued a decision bearing on the Martin Act preemption question, *see Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341 (2011), the district court called for further briefing.  *See* No. 08 Civ. 10922 (DAB), Dkt. 119.  While that briefing was underway, however, the parties notified the district court that plaintiffs would be submitting a stipulation of dismissal of their claims against Merkin and GCC; accordingly, on June 4, 2013, the district court stayed the case as to those defendants.  *See id.*, Dkt. 127.

### F.      Procedural History

On March 7, 2013, KM filed the Complaint.  Dkt. 1.  On May 8, 2013, pursuant to the Court's scheduling order, *see* Dkt. 7, defendants moved to dismiss the Complaint.  Dkt. 13 ("Def. Br.").  On May 15, 2013, KM moved to strike certain documents filed by defendants in support of the motion to dismiss.  Dkt. 16 ("Pl. MTS Br.").  On May 24, 2013, KM opposed the motion to dismiss.  Dkt. 20 ("Pl. Br.").  On June 6, 2013, defendants filed a reply in support of the motion to dismiss, Dkt. 26 ("Def. Reply Br."), and an opposition to KM's motion to strike, Dkt. 28 ("Def. MTS Br.").  On June 20, 2013, KM filed a reply in support of its motion to strike. Dkt. 31 ("Pl. MTS Reply Br.").

---

[4] *See also* No. 08 Civ. 10922 (DAB), Dkt. 98, at ¶ 50 (noting that the entity referred to herein as Ascot Fund is an investment vehicle created to facilitate investments by foreign investors in the entity referred to herein as Ascot Partners, and that Ascot Fund holds a limited partnership interest in Ascot Partners); *accord* Compl. ¶ 18 (alleging that Ascot Fund was "simply . . . a single, albeit large, limited partner in Ascot Partners").

On July 8, 2013, the Court heard argument on the motions.  *See* Transcript of Oral

Argument ("Tr.").  On July 10, 2013, the Court issued an Order directing the parties to meet and

confer and jointly submit an executed version of the subscription agreement referenced in the

Complaint, as both parties had submitted incomplete or unexecuted versions of that document in

their competing submissions.  Dkt. 35.  On July 15, 2013, the parties submitted separate letters,

eventually stipulating to which documents are properly considered on this motion.  *See* Dkt. 36–

37.

## II.   Applicable Legal Standards

In resolving a motion to dismiss, the Court must "construe the Complaint liberally,

accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences

in plaintiff['s] favor."  *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012).

Nevertheless, the "[f]actual allegations must be enough to raise a right to relief above the

speculative level," and the complaint must plead "enough fact[s] to raise a reasonable

expectation that discovery will reveal evidence of [plaintiff's claim]."  *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555–56 (2007).  Put differently, "[t]o survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 570).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 556).  "A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*,

550 U.S. at 555).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In addition, a claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b). *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006).  Rule 9(b) provides:  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The Second Circuit has clarified that although intent may be alleged generally, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations."  *Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted).  Rather, plaintiffs must allege facts that "give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

## III.   KM's Motion to Strike

KM moves to strike 10 of the 11 exhibits attached to the Declaration of Daphne Ha in Support of Defendants' Motion to Dismiss the Complaint.  *See* Pl. MTS Br. 1.  However, only two of the documents that KM seeks to strike are germane to the Court's decision—Exhibits 2 and 3 to the Ha Declaration.  Accordingly, the Court addresses the motion to strike only as to these two documents.[5]

---

[5] KM does not move to strike Exhibit 1.  Exhibits 4-11 to the Ha Declaration, which the Court does not consider in resolving the motion to dismiss, include excerpts from the transcript of the *Weiderhorn* arbitration, minutes of various meetings of the Yeshiva University Board of Trustees

In considering a motion to dismiss, the Court may consider the factual allegations in the Complaint, as well as "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "Where a document is not incorporated by reference, the court may [nevertheless] consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable, LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). But even where a document is "integral" to the complaint, there must be no dispute as to its authenticity or relevance for it to be considered on a motion to dismiss. *Id.* Moreover, "*reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original). For instance, when the complaint alleges that a document, such as a document filed with the SEC, "made a particular representation, the court may properly look at the document to see whether that representation was made." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). In doing so, however, the court considers the documents "only to determine *what* the documents stated, and *not to prove the truth of their contents*." *Id.* (citation omitted) (emphasis in original).

---

and yearly conflict of interest reports provided to the Board, and an email from Benjamin Jesselson to his brother Michael. Defendants included these documents on the theory that they were relevant to the knowledge of KM's board. *See* Def. Br. 7. KM also objects to defendants' citation to two newspaper articles that report on the SEC's failure to uncover Madoff's fraud, and to defendants' reference to Merkin's alleged personal investment in the Ascot Fund. *See* Pl. MTS Br. 7. These materials, too, are not germane to the questions presented, and the Court disregards them.

Exhibit 2 to the Ha Declaration is a copy of Ascot Fund's January 2003 Prospectus. Although KM originally asserted that it never received this prospectus, *see* Pl. MTS Br. 2, it later conceded that it did, *see* Pl. MTS Reply Br. 7.  KM nevertheless argues that the prospectus may not be considered on this motion, because it was not a document that KM relied on in bringing suit.  Rather, KM argues, it relied on the December 2002 Offering Memorandum.  But the December 2002 Offering Memorandum applies to investments in Ascot *Partners*, whereas the January 2003 Prospectus applies to investments in Ascot Fund.  *See* 2002 Offering Memorandum, at 1; 2003 Prospectus, at 1.  It is therefore not clear whether the Complaint's reliance on the 2002 document is based on a mistake, or an allegation that because, as of January 1, 2003, the two investments were essentially one and the same, *see* Compl. ¶ 18, it was possible to rely on either document as describing the investment.  In any event, the dispute as to which document the Court may properly rely is rendered moot by the fact that the material provisions of the two documents are substantially identical.  *See supra*, Part I(D).  Accordingly, the Court will consider the language that is common to the two documents to the extent relevant.

Exhibit 3 to the Ha Declaration is an unsigned copy of a subscription agreement that KM allegedly executed with Ascot Fund.  KM argues that this document is not properly considered, because it consists of an unexecuted set of forms that apply to a different security and differ from the governing documents that KM did execute with Ascot Fund.  *See* Pl. MTS Reply Br. 1.  KM has asserted a claim for breach of the duty of good faith and fair dealing implied in the parties' agreement, and thus the agreement between KM and Ascot Fund is integral to the Complaint. *See Chambers*, 282 F.3d at 153; *Cortec Indus., Inc. v. Sum Holding LP*, 949 F.2d 42, 48 (2d Cir. 1991).  To ensure that the Court had access to that agreement, the Court ordered the parties to either submit the executed form of the agreement, or, if that were impossible, to stipulate that the

language in an unexecuted version mirrored that of the signed agreement.  In response, the

parties stipulated, *see* Dkt. 36–37, that two subscription application forms govern the parties'

relationship:  (1) one dated October 1, 2002, relating to KM's initial investment of $1 million,

*see* Bamberger MTS Decl. Ex. B; and (2) one dated December 14, 2003, relating to KM's later

investment of $500,000, *see id.* Ex. E.  The former incorporates by reference the terms of the

1996 Prospectus, *see id.* Ex. B, whereas the latter incorporates by reference the former, *see id.*

Ex. E.  Accordingly, the Court will consider these exhibits, rather than Exhibit 3 to the Ha

Declaration.

## IV.    Defendants' Motion to Dismiss

KM asserts five claims: fraud; breach of fiduciary duty; breach of the duty of good faith

and fair dealing; gross negligence; and unjust enrichment.  Defendants argue that each claims is

untimely, *see* Def. Br. 10–11, and fails to state a claim upon which relief may be granted, *see id.*

at 12–24.  The Court addresses each claim in turn.  For the reasons that follow, each claim must

be dismissed.[6]

### A.    Fraud

#### 1.    Statute of Limitations

Under New York law, an action based upon fraud must be commenced within six years

of the date the cause of action accrued, or within two years of the time the plaintiff discovered or

could have discovered the fraud with reasonable diligence, whichever is greater.  N.Y. C.P.L.R.

§ 213(8); *see Carbon Capital Mgmt., LLC v. Am. Express Co.*, 88 A.D.3d 933, 939 (2d Dep't

---

[6] In light of these shortcomings, the Court has no occasion to consider defendants' additional
argument for dismissal, that KM's breach of fiduciary duty, gross negligence, and unjust
enrichment claims belong to Ascot Fund and not to the shareholders individually.  *See* Def. Br.
12.  Nor does the Court have occasion to consider KM's claim for punitive damages.  *See* Def.
Br. 23; Pl. Br. 34–35.

2011).  "A cause of action to recover for damages for fraud cannot accrue until every element of the claim, including injury, can truthfully be alleged."  *Carbon Capital Mgmt.*, 88 A.D.3d at 939 (alterations omitted) (quoting *N.Y.C. Transit Auth. v. Morris J. Eisen, PC*, 276 A.D.2d 78, 85 (1st Dep't 2000)).

KM's causes of action based on fraudulent misrepresentations or omissions in the offering documents accrued on the dates it invested in Ascot Fund—October 1, 2002 and January 1, 2004.  *See id.*; *accord Malone v. Bayerische Hypo-Und Vereins Bank*, No. 08 Civ. 7277 (PGG), 2010 WL 391826, at *5 (S.D.N.Y. Feb. 4, 2010), *aff'd*, 425 F. App'x 43 (2d Cir. 2011) (summary order); *AIG Managed Mkt. Neutral Fund v. Askin Capital Mgmt., LP*, 197 F.R.D. 104, 108 n.2 (S.D.N.Y. 2000); *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763, 770 (S.D.N.Y. 1993); *Gould v. Berk & Michaels, P.C.*, No. 89 Civ. 5036 (SWK), 1991 WL 152613, at *5 (S.D.N.Y. July 29, 1991).  Under the six-year rule, these claims are untimely, because KM's Complaint was filed on March 7, 2013.  They are also untimely under the two-year discovery rule, because Madoff's fraud, Ascot Fund's exposure to Madoff, and the alleged misrepresentations were revealed in December 2008, more than four years before the Complaint was filed.  Thus, absent an applicable toll, KM's fraud claims based on misrepresentations in the offering documents are untimely.  KM concedes as much.  *See* Pl. Br. 20 ("With *American Pipe* tolling, KM has filed these claims in timely fashion.").

### 2.   *American Pipe* Tolling

KM argues that the relevant limitations period was tolled, under the *American Pipe* doctrine, by the putative federal class action in *In re Merkin*, which, as noted, was filed on December 16, 2008 and is currently pending in this District.  *See* Pl. Br. 20.  In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), involving a putative class-action antitrust suit,

the district court ruled that the suit could not be maintained as a class action because plaintiffs failed to satisfy the Rule 23 "numerosity" requirement.  Several putative class members then filed motions to intervene, but the district court denied those motions because the applicable statute of limitations had run while the class litigation was pending.  *See id.* at 543–44.  The Supreme Court affirmed the reversal of that decision.  It held that "the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  *Id.* at 554.  The Supreme Court later elaborated on the reasoning behind the rule:

> The *American Pipe* Court recognized that unless the statute of limitations was tolled by the filing of the class action, class members would not be able to rely on the existence of the suit to protect their rights.  Only by intervening or taking other action prior to the running of the statute of limitations would they be able to ensure that their rights would not be lost in the event that class certification was denied. . . .  A putative class member who fears that class certification may be denied would have every incentive to file a separate action prior to the expiration of his own period of limitations.  The result would be a needless multiplicity of actions—precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid.

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350–51 (1983).

The Second Circuit has recently observed that *American Pipe* contains "conflicting indications of the source of authority for its tolling rule, and the Supreme Court's subsequent statements on the matter—all in *dicta*—provide little clarity."  *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, No. 11-2998, 2013 WL 3214588, at *5 (2d Cir. June 27, 2013). On one hand, *American Pipe* "relied heavily on Rule 23, reasoning that a contrary holding would 'frustrate the principal function of a class action' and create a 'multiplicity of activity which Rule 23 was designed to avoid.'"  *Id.* at *3 (quoting *American Pipe*, 414 U.S. at 551, 555).  On the other, *American Pipe* "also seemed to rely on the equitable power of the courts to toll statutes of

limitations."  *Id.*; *see American Pipe*, 414 U.S. at 555 ("[T]he tolling rule we establish here is

consistent both with the procedures of Rule 23 and with the proper function of the limitations

statute.").  The Second Circuit observed that the federal courts of appeal, and district courts in

this District, have split on the question whether *American Pipe* contemplates statutory tolling

based on Rule 23 or judicial tolling based on principles of equity.  *IndyMac*, 2013 WL 3214588,

at *5–6 (surveying split in authority, but declining to resolve this issue).[7]

  To be sure, *American Pipe* did not itself announce a tolling rule applicable to state law

claims.  Where the timeliness of state law claims is at issue, a federal court "must look to the law

of the relevant state to determine whether, and to what extent, the statute of limitations should be

tolled by the filing of a putative class action in another jurisdiction."  *Casey v. Merck*, 653 F.3d

95, 100 (2d Cir. 2011); *accord Vincent v. The Money Store*, No. 11 Civ. 7685 (JGK), 2013 WL

57794, at *5 (S.D.N.Y. Jan. 4, 2013) ("The plaintiffs must look to any state analogue to

*American Pipe* tolling rather than *American Pipe* itself.").  "New York courts have . . . long

embraced the principles of *American Pipe*."  *Cullen v. Margiotta*, 811 F.2d 698, 719 (2d Cir.

1987) (collecting cases); *accord Paru v. Am. Life Ins. Co.*, 52 A.D.3d 346, 348 (1st Dep't 2008);

*Saperstein-Stone-Weiss Found. v. Merkin*, No. 13 Civ. 415 (VM), 2013 WL 2495141, at *3

(S.D.N.Y. June 11, 2013).  Thus, "[i]t is also appropriate to apply federal case law interpreting

the scope and application of *American Pipe* tolling."  *Choquette v. City of N.Y.*, 839 F. Supp. 2d

692, 697 n.3 (S.D.N.Y. 2012).

  Critical here, because *American Pipe* tolling is designed in part to avoid the need for

individual plaintiffs to bring claims that substantially overlap with the pending class action and

---

[7] *American Pipe* tolling does not apply to statutes of repose, but only to statutes of limitations.
*IndyMac MBS, Inc.*, 2013 WL 3214588, at *6–7.  Defendants here argued that N.Y. C.P.L.R.
§ 201 is a statute of repose.  *See* Dkt. 32.  The Court does not reach that issue, because it finds
*American Pipe* tolling unavailable even assuming § 201 is a statute of limitation.

thereby undermine the Rule 23 class mechanism, to take advantage of the toll, a plaintiff must have been a member of the purported class:  "[T]he commencement of a class action suspends the applicable statute of limitations as to all *asserted* members of the class who *would have been parties* had the suit been permitted to continue as a class action."  *American Pipe*, 414 U.S. at 554 (emphasis added); *see also Boyd v. J.E. Robert Co.*, No. 05-cv-2455 (KEM)(RER), 2010 WL 5772892, at *6 (E.D.N.Y. May 31, 2010), *report and recommendation adopted by* 2011 WL 477547 (E.D.N.Y. Feb. 2, 2011) (plaintiff who is not a member of purported class may not invoke equitable tolling).

That is not the case here.  KM was not a member of the putative class:  KM invested in Ascot Fund Limited, the Cayman corporation referred to herein as "Ascot Fund," whereas the Merkin class action was brought on behalf of investors in Ascot Partners, Gabriel Fund, and Ariel Fund, but *not* Ascot Fund.  *See* No. 08 Civ. 10922 (DAB), Dkt. 98 (Fourth Consolidated Amended Class Action Complaint), ¶¶ 1–2, 32–35, 50.  Therefore, the filing of the *In re Merkin* class action cannot serve to toll KM's claims.[8]

Alternatively, KM argues that it is entitled to *American Pipe* tolling based on a separate lawsuit: the Martin Act litigation brought by the NYAG.  *See* Dkt. 33 (letter to Court with supplemental briefing on *American Pipe* issue).  The Court is unpersuaded.  The purpose of *American Pipe* tolling is to avoid needless individual actions that parallel a pending class action and are brought by a member of the putative class.  *See American Pipe*, 414 U.S. at 551, 555; *IndyMac MBS*, 2013 WL 3214588, at *3.  But a Martin Act lawsuit brought by the state Attorney

---

[8] The claims brought here, save for the breach of the duty of good faith, were all brought in the investor class action.  *See In re Merkin*, 817 F. Supp. 2d at 349; *see also* No. 08 Civ. 10922 (DAB), Dkt. 98 (Fourth Consolidated Amended Class Action Complaint), ¶¶ 247–52 (breach of fiduciary duty); 264–68 (gross negligence); 269–74 (unjust enrichment); 275–81 (common law fraud).

General is fundamentally different. It does not purport to aggregate claims of individual plaintiffs. Instead, it is a regulatory tool aimed at vindicating public policy objectives. And the New York Court of Appeals, in recently rejecting the argument that the Martin Act preempts private common law causes of action, clearly anticipated parallel proceedings by the Attorney General and private litigants. *See Assured Guar. (UK) Ltd. v. JP Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 353 (2011). Further, the statute invoked by the NYAG (the Martin Act) differs from common law claims brought here, unlike in the context where *American Pipe* tolling applies, in which the foregone individual claims track those brought in the class action. For all these reasons, KM's claim that the policies underlying *American Pipe* support tolling based on the NYAG's Martin Act lawsuit is unpersuasive.

In a final argument for *American Pipe* tolling, KM notes that such tolling has been justified by some courts as an application of the court's equitable authority, *see IndyMac*, 2013 WL 3214588, at *6–7, and argues that equitable principles support tolling here. But, even assuming that *American Pipe* countenanced tolling based on broad equitable principles, these principles do not favor KM here. KM makes two equitable arguments. First, KM notes that, even though it was not a member of the *In re Merkin* class, it was an indirect investor in Ascot Partners, through Ascot Fund, and Ascot Partners was a member of the class. KM asserts that, despite falling outside the class definition, it believed that its interests would be protected "by the prominent and savvy Wall Street class action lawyers whose fees are tied to the size of any recovery pools and who therefore seek to maximize the size of the recovery subclasses whenever and wherever, as here, it is reasonably possible and indeed *easy* to do." *See* Dkt. 33 (emphasis in original). But KM is not an unrepresented ward who may credibly throw itself upon the mercy of a court. KM was itself, at all relevant times, represented by counsel. KM's counsel's

mistaken belief that lawyers for a class, whose definition clearly excluded KM, would somehow look out for his client's rights is a singularly unpersuasive basis for equitable tolling. *Cf. Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) ("[E]quitable tolling is only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights." (citations and alterations omitted)).

In invoking equitable principles, KM separately argues that it relied on the NYAG, in bringing and then settling the Martin Act case, to protect its interests. Because, however, the settlement agreement that the NYAG entered into with Merkin effectively excluded KM, the NYAG's lawsuit ultimately did not benefit KM. Compl. ¶ 12. At argument, the Court pursued with KM's counsel the reasons KM had foregone a lawsuit in its own name. That colloquy revealed that KM's decision to gamble on obtaining relief from the NYAG action, rather than filing its own lawsuit, was a strategic choice animated by the desire to save legal costs:

> THE COURT:  I had understood you to be saying earlier that you made a conscious decision on behalf of Keren Matana to forgo an expensive civil lawsuit such as this in the view that you would obtain relief from the AG action. Correct?
> MR. BAMBERGER:  I used those words. I said I was a fact witness. I didn't make that decision. Mr. Jesselson and others at Keren Matana made that decision. But based on my perception and recommendations, yes.
> THE COURT: So Mr. Jesselson was the person acting for Keren Matana, correct, in making decisions of what lawsuits to initiate?
> MR. BAMBERGER:  Actually, by that time his wife and a CPA named Aaron Tratner were the formal decision-makers for Keren Matana. But he still talked to them about these issues, yes. He is the quarterback.
> THE COURT:  As the quarterback, the playbook or the strategy was forgo expensive legal claims given that we are likely to get relief from the AG, correct?
> MR. BAMBERGER: Correct.
> THE COURT:  So it was a considered decision through 2013 to forgo a lawsuit such as this one?
> MR. BAMBERGER: Absolutely.

Tr. 53.

Having strategically chosen to conserve litigation costs by relying on the NYAG, thereby running the risk that it would not receive any benefit from the NYAG action and be time-barred from initiating its own lawsuit, KM cannot credibly argue now that equity warrants tolling its claims. *See Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 96 (1990) ("We have allowed equitable tolling in situations . . . where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights."). And KM's suggestion that bringing its own lawsuit was preclusively expensive is unpersuasive: KM was at liberty to bring a timely suit against Merkin, and then ask that that litigation be stayed pending the outcome of the NYAG's Martin Act case. To be sure, if KM's claim is true that the NYAG agreed to settlement terms that effectively allowed Merkin, out of spite, to exclude KM from recovery, that would raise substantial questions about the NYAG's exercise of discretion in the settlement process. But the integrity of the NYAG settlement is not before this Court. KM's fraud claims are not entitled to equitable tolling.

Therefore, to the extent KM's fraud claim is based on misrepresentations in the offering documents, it is untimely.

### 3.    KM's "Holder" Theory of Liability

Although KM's fraud claim is primarily based on alleged misrepresentations in the offering documents, the Complaint also alleges, albeit briefly, that defendants committed fraud by "inducing KM to retain . . . its investment with Merkin, by issuing a stream of quarterly letters to investors which painted a completely misleading picture of Merkin." Compl. ¶ 101; *see also id.* ¶ 18. Three such letters fall within the six-year limitations period. *Id.* ¶ 101 (letters dated

April 20, 2007; January 20, 2008; and July 21, 2008).  Thus, insofar as KM has pled a substantively colorable "holder" claim based on alleged material misrepresentations in these letters, its fraud claim would be timely.

A "holder" claim is one "in which the plaintiffs allege that material misrepresentations or omissions caused them to *retain* ownership of securities that they acquired prior to the alleged wrongdoing."  *In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 318–23 (S.D.N.Y. 2004) (Cote, J.) (emphasis added) (surveying law from different jurisdictions on holder claims).  The New York Court of Appeals has not resolved with finality whether New York law recognizes such a retention-based theory of fraud.  The Appellate Division, First Department, has recently held that New York law does not recognize a holder claim seeking to recover lost profits.  It reasoned that such a claim is at odds with New York's "out-of-pocket rule," under which the measure of damages for fraud is "to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained."  *Starr Found. v. Am. Int'l Grp., Inc.*, 76 A.D.3d 25, 27 (1st Dep't 2010) (citation omitted).  The decision in *Starr* may be read—as indeed it was by the dissent—as precluding holder claims regardless of whether they seek to recover lost profits or simply losses.  *See id.* at 45 (Moskowitz, J., dissenting) ("Under the majority's reasoning, holder claims could never be viable.").  On the other hand, *Starr* assumed the continuing validity of *Continental Insurance Co. v. Mercadente*, 222 A.D. 181 (1st Dep't 1927), which upheld a claim by plaintiffs that they had been fraudulently induced to retain an investment that ended up substantially worthless.  *Starr* distinguished *Mercadente* on the ground that the plaintiffs in *Mercadente* were seeking to recover an out-of-pocket loss—*i.e.*, their entire investment—whereas the plaintiffs in *Starr* sought to recover the value of profits they might have reaped had they sold the securities earlier.  *Starr*, 76 A.D.3d at 33.  Notably, prior to

20

*Starr*, the Second Circuit had relied on *Mercadente* for the proposition that New York law permits holder claims, *see Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982), and judges in this District have predicted that New York law would recognize such a claim, *see, e.g.*, *Prime Mover Capital Partners, LP v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 672 n.108 (S.D.N.Y. 2011) (Kaplan, J.); *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005) (Cote, J.).

However, even assuming that New York law would permit a satisfactorily pled holder claim along the lines of that in *Mercadente* to go forward, KM has failed to plead such a claim with the particularity required by Rule 9(b). *See Eternity Global Master Fund Ltd.*, 375 F.3d at 187. "Proof of fraud under New York law requires a showing that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)). Here, the only allegations in the Complaint that would form the basis of a timely holder claim are three paltry parenthetical references to excerpts of letters allegedly sent to Ascot Fund investors within the six-year limitations period. *See* Compl. ¶ 101. On their face, it is dubious that these statements are material: one refers to "play[ing] *defense, defense, defense*"; the other two state that "[t]he combination of some talent and *a lot of diligence* got us through a rocky 2007, and we hope to employ the same formula good [*sic*] if not better effect in calmer years ahead," and that "*we remain focused on preserving principal* and committed to managing risk."

*Id.* (alterations and emphasis in Complaint).  The pleadings are also inadequate to allege that KM

reasonably relied on these snippets as a basis for retaining its investment in Ascot Fund.[9]

Accordingly, KM's sparsely-pled claim of fraud, to the extent based on a holder theory,

must be dismissed.  However, for the reasons discussed in Part V, *infra*, the dismissal of KM's

fraud claim, to the extent based on a holder theory, is without prejudice.  KM is at liberty to file

an Amended Complaint, asserting its holder claim with greater particularity.  Defendants, of

course, will be at liberty to seek dismissal of such Amended Complaint.  Should defendants

argue that New York law no longer recognizes any form of holder claim, the Court would expect

and invite thorough briefing on that point.

### B.     Breach of Fiduciary Duty

"New York law does not provide a single statute of limitations for breach of fiduciary

duty claims.  Rather, the choice of the applicable limitations period depends on the substantive

remedy that the plaintiff seeks."  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d

132, 139 (2009).  "Where the remedy sought is purely monetary in nature, courts construe the

suit as alleging 'injury to property' within the meaning of CPLR 214(4), which has a three-year

limitations period."  *Id.*  However, where the relief sought is equitable, a six-year period applies.

*Id.*  And where the breach of fiduciary duty claim is based on an allegation of fraud, the six-year

statute of limitations in N.Y. C.P.L.R. § 213(8) applies, along with its two-year discovery rule.

*See id.*; *Kaufman v. Cohen*, 307 A.D.2d 113, 122 (1st Dep't 2003); *see also Cohen v. S.A.C.*

*Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013).

---

[9] At argument, defense counsel represented that the letters referenced were sent to investors in
Gabriel Fund, not Ascot Fund.  Tr. 47.  In the event of an Amended Complaint citing these
letters, the Court expects that KM would attach these letters and would amplify its theories of
materiality and reliance.

Assuming that fraud has been pled adequately, whether a plaintiff may take advantage of the longer limitations period turns on whether the fraud claim is "essential" to the breach of fiduciary duty claim, *see IDT*, 12 N.Y.3d at 139, or whether the fraud claim is "incidental" to the fiduciary duty claim, *see Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 545 (2d Cir. 1999). *See also Kaufman*, 307 A.D.2d at 120; *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 120 (1st Dep't 1985), *aff'd*, 67 N.Y.2d 981 (1986); *Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 263–64 (1937). "Where the alleged fraud is merely 'the means of accomplishing the breach and adds nothing to the causes of action', the statute of limitations applicable to fraud claims will not control." *Powers Mercantile Corp.*, 109 A.D.2d at 120 (quoting *Iandoli v. Asiatic Petroleum Corp.*, 57 A.D.2d 815, 816 (1st Dep't 1977)); *accord Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 395 (S.D.N.Y. 2010). Put differently, "[a] fraud action is not incidental only when: (1) the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; and (2) the injuries caused by the fraud are distinct from the injuries caused by the alternate claim." *Corcoran*, 202 F.3d at 545.

Here, the fraud allegations are incidental to the fiduciary duty claim, for two reasons. First, KM's allegations of breach of fiduciary duty are substantially identical to its allegations of fraud. Both the fraud and fiduciary duty claims are based on defendants' misrepresentations in the offering memoranda and subsequent letters, and on defendants' alleged subsequent failure to correct those misrepresentations. *Compare* Compl. ¶ 86, *with id.* ¶¶ 90, 98–101. Second, the injuries alleged in the two claims are not distinct. Rather, both causes of action seek the same relief. *Compare* Compl. ¶ 88, *with id.* ¶ 103. For these reasons, and because KM seeks monetary, not equitable, relief, the three-year limitations period applies.

KM's claim accrued, by virtue of the fiduciary repudiation doctrine, in December 2008. *See Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 518 (2d Cir. 2001); *Access Point Med., LLC v. Mandell*, 106 A.D.3d 40, 45 (1st Dep't 2013); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 445 (S.D.N.Y. 2010) (administrators and custodians of Madoff feeder-fund repudiated fiduciary duties when Madoff's fraud was exposed). Applying the three-year limitations period, this claim is untimely. For the reasons stated in Part IV(A)(2), *supra*, *American Pipe* tolling does not apply. KM's breach of fiduciary duty claim is dismissed.

### C.      Breach of the Duty of Good Faith and Fair Dealing

#### 1.      Statute of Limitations

A six-year limitations period applies to claims for breach of an implied contractual duty. N.Y. C.P.L.R. § 213(2); *see VEC Corp. of Del. v. Hilliard*, 896 F. Supp. 2d 253, 259 (S.D.N.Y. 2012); *Callahan v. Credit Suisse, Inc.*, 10 Civ. 4599 (BSJ), 2011 WL 4001001, at *7 (S.D.N.Y. Aug. 18, 2011); *Flights Scis., Inc. v. Cathay Pac. Airways Ltd.*, 647 F. Supp. 2d 285, 288 (S.D.N.Y. 2009). "A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach. The plaintiff need not be aware of the breach or wrong to start the period running." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (citing *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993)). "If, however, a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." *Id.* at 150 (collecting cases); *see Bice v. Robb*, 324 F. App'x 79, 80 (2d Cir. 2009) (summary order) (reversing dismissal of complaint as untimely, where promise to manage family business may have imposed a continuing duty); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 261 (S.D.N.Y. 2008) (duty to share equally in corporate opportunities was continuing duty). Assuming that a contract existed between KM and

defendants that imposed a continuing duty of good faith and fair dealing, that duty would have continued until December 2008, making KM's claim timely.

**2.      Merits**

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State Street Bank & Trust Co. v. Inversiones Errazuriz Ltd.*, 374 F.3d 158, 169 (2d Cir. 2004) (citation omitted).  "Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Servs.*, 87 N.Y.2d 384, 389 (1995) (citation omitted).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *State Street*, 374 F.3d at 169.  However, for such a duty to be implied, the parties must be in a contractual relationship.  *See La Barte v. Seneca Res. Corp.*, 285 A.D.2d 974, 975 (4th Dep't 2001); *Four Winds of Saratoga Inc. v. Blue Cross & Blue Shield of Cent. N.Y. Inc.*, 241 A.D.2d 906, 907 (4th Dep't 1997) ("There being no contractual relationship, neither can there be any 'covenant of good faith and fair dealing' implied which itself is based on the existence of a legal contractual obligation.").

Here, KM argues, *see* Dkt. 36, and defendants have stipulated, *see* Dkt. 37, that the documents that govern KM's investments in Ascot Fund are the two subscription applications that KM executed.  *See* Bamberger MTS Decl. Ex. B, E.  The Complaint alleges that defendants breached the covenant implied in those agreements when they failed to conduct adequate due diligence on Madoff and failed to warn investors in Ascot Fund that Madoff did not permit them to perform due diligence.  Compl. ¶ 107.  However, the two subscription applications that KM executed do not list either Merkin or GCC as parties—the agreements are instead between KM

25

and Ascot Fund.  *See* Bamberger MTS Decl. Ex. B, E.  Because the defendants here are not parties to the agreements that govern KM's investment in Ascot Fund, KM may not maintain an implied contractual claim against them.  This claim is dismissed.

### D.    Gross Negligence

A three-year statute of limitations applies to claims sounding in negligence.  N.Y. C.P.L.R. § 214(4).  A cause of action for negligence accrues at the time of the injury.  *Barrell v. Glen Oaks Vill. Owners, Inc.*, 29 A.D.3d 612, 613 (2d Dep't 2006).  KM argues that defendants' negligence continued through December 11, 2008.  But even assuming this to be true, KM's claim is untimely, absent *American Pipe* tolling, as KM concedes.  *See* Pl. Br. 22 ("KM's [gross negligence] claims were interposed in timely fashion under *American Pipe*.").  For the reasons stated in Part IV(A)(2), *supra*, *American Pipe* tolling is unavailable.  KM's gross negligence claim is dismissed.

### E.    Unjust Enrichment

#### 1.    Statute of Limitations

Under New York law, the statute of limitations applicable to an unjust enrichment claim depends on the nature of the substantive remedy plaintiff seeks.  *Loengard v. Sante Fe Indus., Inc.*, 70 N.Y.2d 262, 266 (1987).  The limitations period is six years where plaintiff seeks an equitable remedy, but three years where plaintiff seeks monetary damages.  *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007); *see Lia v. Saporito*, 909 F. Supp. 2d 149, 167 (E.D.N.Y. 2012); *Kermanshah*, 580 F. Supp. 2d at 261; *Grynberg v. Eni S.P.A.*, No. 06 Civ. 6495 (RLC), 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007).  The applicable limitations period begins to runs "upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the

time the facts constituting the fraud are discovered." *Cohen*, 711 F.3d at 364 (quoting *Coombs v. Jervier*, 74 A.D.3d 724, 724 (2d Dep't 2010)).

KM's claim of unjust enrichment is based on defendants' collection of an annual management fee on KM's investments in Ascot Fund, and seeks disgorgement of those fees. *See* Compl. ¶¶ 115–19.  Assuming that the relief KM seeks is properly characterized as an equitable claim for disgorgement, *see Access Point Med.*, 106 A.D.3d at 46–47, this claim would be timely as to any fees collected on or after March 7, 2007, *i.e.*, six years before the filing of the Complaint.  KM has not specifically alleged the date defendants last collected such a fee. However, because the Complaint alleges that this was an annual fee, it is reasonable to infer that such a fee was collected at least once between March 2007 and December 2008, when Madoff's fraud was revealed.  Accordingly, the Court construes this claim to be timely, albeit limited to fees collected on or after March 7, 2007.

### 2.    Merits

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). However, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987); *accord EBC I v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 23 (2005).

Here, as noted, KM's investments in Ascot Fund were governed by the two subscription applications, which incorporate the 1996 Prospectus by reference.  *See* Bamberger MTS Decl. Ex. B, E.  The 1996 Prospectus governs the payment of management fees from Ascot Fund to

defendants, *see* 1996 Prospectus, at 5, 12–13, which is the subject matter of KM's claim, *see*

Compl. ¶¶ 115–19.  Accordingly, KM's unjust enrichment claim is precluded.  *See Clark-*

*Fitzpatrick*, 70 N.Y.2d at 388; *Sapirstein-Stone-Weiss Found.*, 2013 WL 2495141, at *7.[10]  This

claim is dismissed.

## V.      Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint shall

be "freely" given when "justice so requires."  However, "it is within the sound discretion of the

district court to grant or deny leave to amend."  *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir.

2009) (citation omitted).  The Supreme Court has directed courts to grant leave to amend under

Rule 15 in the absence of factors "such as undue delay, bad faith or dilatory motive on the part of

the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment,

etc."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *accord McCarthy v. Dun & Bradstreet Corp.*,

482 F.3d 184, 200–01 (2d Cir. 2007).  As relevant here, "futility" under Rule 15 turns on

whether a proposed pleading would be able to withstand a dispositive pretrial motion.  *See*

*Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2011); *Touchtunes Music Corp. v.*

*Rowe Int'l Corp.*, 847 F. Supp. 2d 606, 621 (S.D.N.Y. 2012).  Here, amendment would be futile

as to all but two of KM's claims.

---

[10] *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010), which involved similar allegations that defendants were unjustly enriched when they collected management fees for steering plaintiffs' investments to Madoff, is not to the contrary.  Although the court denied defendants' motion to dismiss the unjust enrichment claim, it did so because "the fog of multiple contracts, sub-agreements and Placement Memos that obscure this litigation" prevented it from determining, at the motion to dismiss stage, whether a valid contract governed the payment of fees.  *Id.*  The court clarified that plaintiffs' unjust enrichment claim would go forward only if "the evidence reveals that no valid contract governed the relationship between Plaintiffs and each of these defendants." *Id.*  Here, by contrast, it is undisputed that the subscription applications, which incorporate by reference the 1996 Prospectus, govern KM's investment with Ascot Fund.

KM's claims for fraud, to the extent based on misrepresentations in the offering documents; breach of fiduciary duty; and gross negligence are all time-barred. Amendment would not cure this deficiency. *See Apionishev v. Columbia Univ.*, No. 09 Civ. 6471 (SAS), 2011 WL 1197637, at *8 (S.D.N.Y. Mar. 25, 2011); *de la Fuente v. DCI Telecommc'ns, Inc.*, 206 F.R.D. 369, 387 (S.D.N.Y. 2002). Similarly, KM's claim for unjust enrichment fails as a matter of law because Ascot Fund's payment of management fees to defendants is governed by the 1996 Prospectus, as incorporated in the agreements between KM and Ascot Fund. Amendment would not cure this deficiency. *See Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs. Inc.*, No. 11-4825 (SJF)(ETB), 2012 WL 5289606, at *14 (E.D.N.Y. Sept. 13, 2012), *report and recommendation adopted by* 2012 WL 5289587 (E.D.N.Y. Oct. 24, 2012); *Trafalgar Power Inc. v. Aetna Life Ins. Co.*, 396 B.R. 584, 595 (N.D.N.Y. 2008), *vacated in part and aff'd in relevant part*, 401 F. App'x 584 (2d Cir. 2010) (summary order). These claims are therefore all dismissed with prejudice.

KM's claim for fraud, to the extent based on misrepresentations made in letters sent to Ascot Fund investors within the six-year limitations period and which allegedly induced KM to retain its investment, however, is timely. This holder claim was instead dismissed due to deficient pleading. It is conceivable that KM may be able to remedy that deficiency in an amended complaint.

KM's claim for breach of the duty of good faith and fair dealing failed because KM could not identify a contract between KM and defendants that would imply such a duty. However, given the long-running relationship between the parties, and the inability of counsel to locate the original subscription agreement executed by KM, *see* Dkt. 37, it is conceivable that KM can identify a contract between it and defendants that would imply such a duty. Accordingly, in an

amended complaint, KM may include a claim of breach of an implied contractual duty claim *if* it can locate such a contract.

The Court wishes to emphasize that leave to amend applies to these two claims alone. The Court does not invite KM to relitigate the claims that have already been dismissed with prejudice, or to add new claims.

## CONCLUSION

Defendants' motion to dismiss the Complaint is granted. Plaintiff's motion to strike is granted in part, and denied in part. Plaintiff is granted leave to amend its holder claim and its breach of implied contractual duty claim. If plaintiff wishes to file an Amended Complaint, it must do so no later than August 20, 2013.

The Clerk of Court is directed to terminate the motions pending at docket numbers 12 and 15.

SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge

Dated: July 30, 2013
       New York, New York