UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :

KEREN MATANA,                             :

                            :        13 Civ. 1534 (PAE)

                   Plaintiff,      :

                            :       OPINION & ORDER

            -v-               :

                            :

J. EZRA MERKIN and GABRIEL CAPITAL   :
CORPORATION,                       :

                            :

                   Defendants.    :

                            :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Keren Matana ("KM"), an Israeli charity, brings this action against J. Ezra

Merkin and Gabriel Capital Corporation ("GCC") (collectively, "defendants").  KM invested

$1.5 million in Ascot Fund Limited ("Ascot Fund"), an off-shore hedge fund managed by

Merkin and GCC.  Ascot Fund, in turn, invested substantially all of its assets with Bernard

Madoff.  KM's investment was wiped out following the revelation that Madoff was operating an

epic Ponzi scheme.  This Court dismissed KM's original Complaint, but granted KM narrowly

limited leave to amend.  KM now brings state law claims of fraud and of a breach of the duty of

good faith and fair dealing.  Defendants move to dismiss.  For the reasons that follow, the motion

to dismiss is granted.

## I.      Background

      On July 30, 2013, the Court granted defendants' motion to dismiss the original Complaint

*See Matana v. Merkin*, No. 13 Civ. 1534 (PAE), 2013 WL 3940825 (S.D.N.Y. July 30, 2013)

("*Matana I*") *reconsideration denied*, No. 13 Civ. 1534, 2013 WL 4010280 (S.D.N.Y. Aug. 6,

2013) (*Matana II*).  This Opinion assumes familiarity with that decision and provides factual

background only as necessary to address the current motion.

### A.  The Parties and the Investment

On October 1, 2002, KM, an Israeli charity then managed by Benjamin Jesselson,

invested $1 million in Ascot Fund.  Am. Compl. ¶ 2.  On January 1, 2003, Ascot Fund became a

limited partner in Ascot Partners, L.P. ("Ascot Partners"), such that KM's sole investment was in

Ascot Partners.  *Id.* ¶ 1.  On January 1, 2004, KM invested another $500,000 in Ascot Fund.  *Id.*

¶ 2.  In 2008, when Madoff's fraud was exposed, the value of Ascot Partners', and thus Ascot

Fund's, investments with Madoff were wiped out; KM lost its $1.5 million investment.  *Matana*

*I*, 2013 WL 3940825, at *2.

### B.  Procedural Background to the Amended Complaint

On March 7, 2013, KM filed suit, bringing state-law claims of fraud, breach of fiduciary

duty, breach of the duty of good faith and fair dealing, gross negligence, and unjust enrichment.

Dkt. 1.

On July 30, 2013, the Court granted defendants' motion to dismiss.  *Matana I*, 2013 WL

3940825, at *16.  The Court denied KM leave to amend the three claims as to which amendment

would be futile: breach of fiduciary duty and gross negligence, which were barred by the statute

of limitations; and unjust enrichment, which was precluded as a matter of law by the presence of

a contract.  *Id.* at *12–16.  The Court similarly denied KM leave to amend the main part of its

fraud claim, which alleged fraudulent misrepresentations or omissions in defendants' offering

documents, because that part of the fraud claim was barred by the statute of limitations.  *Id.* at

*7–11, 16.

The Court granted KM leave to amend two claims.  First, as to the fraud claim, the Court granted KM leave to amend to cure the aspect of that claim that articulated a "holder" theory of fraud, *i.e.,* that alleged defendants had made fraudulent misrepresentations that induced KM to retain, or hold, its investment.  *Id.* at *16.  A holder claim, as opposed to a claim of fraud at the inception of the investment, was potentially timely.  However, the timely holder-claim allegations in the original Complaint were deficient because KM had failed to plead them with particularity, as required by Federal Rule of Civil Procedure 9(b), in that "the only allegations in the Complaint that would form the basis of a timely holder claim [were] three paltry parenthetical references to excerpts of letters allegedly sent to Ascot Fund investors."  *Id.* at *12.  The Court was doubtful that these statements were material; KM had also failed to adequately allege that it "reasonably relied on these snippets as a basis for retaining its investment in Ascot Fund."  *Id.*  But, because it was "conceivable that KM may be able to remedy that deficiency in an amended complaint," the Court granted KM leave to amend.  *Id.* at *16.  The Court noted that, in moving to dismiss, defendants, while primarily attacking deficiencies specific to KM's complaint, had also argued that New York law no longer recognized any form of holder claim. The Court stated that, were defendants to renew that argument on a new motion to dismiss, it "would expect and invite thorough briefing on that point."  *Id.* at *12.

Second, the Court granted KM leave to amend its claim for breach of an implied contractual duty, on one condition.  Counsel had been unable "to locate the original subscription agreement executed by KM."  *Id.* at *16.  As a result, KM had argued, *see* Dkt. 36, and defendants had stipulated, *see* Dkt. 37, that the documents that governed KM's investments in Ascot Fund were the two subscription applications that KM had executed.  *Matana I*, 2013 WL 3940825, at *14.  However, those agreements could not support an implied contractual duty on

3

the part of defendants, because the defendants were not parties to them. *Id.* They were instead

between KM and Ascot Fund. *Id.* The Court found it "conceivable that KM can identify a

contract between it and defendants that would imply such [an implied contractual] duty," and

therefore gave KM leave to "include a claim of breach of an implied contractual duty claim *if* it

can locate such a contract." *Id.* at *16 (emphasis in original).

The Court emphasized that "leave to amend applies to these two claims alone. The Court

does not invite KM to relitigate the claims that have already been dismissed with prejudice, or to

add new claims." *Id.*[1]

On August 2, 2013, KM filed a motion for reconsideration of *Matana I*, on the ground

that the Court erred in denying equitable tolling. Dkt. 42–46. On August 5, 2013, KM submitted

a letter "seek[ing] guidance" from the Court on the preparation of its amended complaint. On

August 6, 2013, the Court denied KM's motion for reconsideration. *Matana II*, 2013 WL

4010280, at *3. The Court separately responded to KM's August 5, 2013 letter. Dkt. 47. The

Court declined to give KM guidance as to its forthcoming Amended Complaint, because "[i]t is

not the proper role of the Court to render an advisory opinion with specific outcomes as to the

matters raised by plaintiff." *Id.* The Court, however, reminded counsel that, in granting leave to

amend, "the Court did not invite, or intend to invite, plaintiff to bring claims or articulate legal

theories that could have been brought earlier in this litigation," but instead had "offered plaintiff

---

[1] KM had foregone its amendment as of right under Federal Rule Civil Procedure 15(a)(1)(B) because, in response to defendant's motion to dismiss, it had elected not to amend its pleading, but instead to oppose the motion to dismiss. Dkt. 58. The Court's Individual Rules then in effect stated that: "If a motion to dismiss is filed, the plaintiff has a right to amend its pleading, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), within twenty-one days. If the non-moving party elects not to amend its pleading, no further opportunity to amend will be granted and the motion to dismiss will proceed in the normal course."

an opportunity to correct the specific failings noted by the Court in granting the motion to dismiss those claims." *Id.*

### C.  The Amended Complaint

On August 6, 2013, KM filed its Amended Complaint.  As to the fraud claim, the Amended Complaint adds allegations that defendants (1) in Ascot Fund's financial statements for fiscal years 2006 and 2007, falsely characterized Merkin's investments advisory fees and Ascot's brokerage agreements, Am. Compl. ¶¶ 6, 67–70, (2) in a series of "Quarterly Letters" sent to Jesselson and other investors in Gabriel Capital, L.P. ("Gabriel"), a separate hedge fund that Merkin managed, misleadingly painted Merkin as "a true portfolio manager," and omitted to mention investments with Madoff, *id.* ¶¶ 7, 72–86; and (3) omitted to report information that Merkin learned, or should have learned, about Madoff in 2007 and 2008, *id.* ¶¶ 90–98.  As to the claim of a breach of an implied duty of good faith, the Amended Complaint identifies one written contract and one oral agreement which, it alleges, give rise to such a duty.

On September 12, 2013, defendants moved to dismiss the Amended Complaint.  Dkt. 53 ("Merkin Br.").  On October 3, 2013, KM opposed the motion to dismiss, Dkt. 58, and later that day amended its opposition, Dkt. 60 ("KM Br.").  On October 18, 2013, defendants replied.  Dkt. 64 ("Merkin Reply Br.").  On November 7, 2013, the Court heard argument.

## II.    Applicable Legal Standards

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor."  *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable

expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

    "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

    In addition, a claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b).  *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006).  Rule 9(b) provides:  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  The Second Circuit has clarified that although intent may be alleged generally, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations." *Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006)

(citation omitted).  Rather, plaintiffs must allege facts that "give rise to a strong inference of

fraudulent intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

## III.   Discussion

### A.  Breach of the Duty of Good Faith and Fair Dealing

In *Matana I*, the Court granted KM leave to amend its claim for breach of an implied

contractual duty of good faith and fair dealing if it could "locate . . . a contract" between the

parties "that would imply such a duty" on the part of defendants.  2013 WL 3940825 at *16.

KM has not "locate[d]" such a contract.  Instead, the Amended Complaint bases its

renewed claim of a breach of implied duty of good faith and fair dealing on two other asserted

agreements.  First, KM asserts, it was an intended third-party beneficiary of the 2002 Ascot

Partners Limited Partnership Agreement ("LPA").  Am. Compl. ¶¶ 44–46, 109.  Second, KM

asserts, there was a previously undiscovered oral contract between Merkin and Jesselson.  *Id.*

¶ 110.

The Amended Complaint does not comply with the Court's directive in *Matana I*.  KM

was not a party to the asserted written contract.  And, as to both asserted contracts, the Amended

Complaint runs afoul of the Court's August 6, 2013 admonition that, in granting leave to amend,

"the Court did not invite, or intend to invite, plaintiff to bring claims or articulate legal theories

that could have been brought earlier in this litigation."  Dkt. 47.  KM's new claims that it was a

third-party beneficiary of an Ascot Partners Agreement, and that Merkin and Jesselson had an

oral agreement, could each just as easily "have been brought earlier in this litigation," and KM

has not endeavored to explain why it did not do so.[2]  KM's new contract claim merits dismissal on this ground alone.

In any event, even if KM's newly articulated claim of a breach of a contractually-implied duty of good faith and fair dealing was properly within the scope of its leave to amend, KM's claim would still require dismissal, because it fails to state a claim.

KM first seeks to situate such a duty in the fact that it was a shareholder of Ascot Fund, and Ascot Fund was a party to the LPA with Ascot Partners.  On this basis, KM asserts, it was a third-party beneficiary of the LPA.  But it is black-letter law that shareholders of a corporation or partnership are not third-party beneficiaries of contracts entered into by that corporation or partnership.  *See, e.g.*, *ASR Levensverzekering v. Breithorn ABS*, 958 N.Y.S.2d 380, 381 (1st Dep't 2013); *Freeford Ltd. v. Pendleton*, 857 N.Y.S.2d 62, 67 (1st Dep't 2008); *Bordereaux v. Salomon Smith Barney Holdings, Inc.*, 703 N.Y.S.2d 112 (1st Dep't 2000).  KM has cited no law to the contrary.

KM next alleges an oral agreement between Jesselson, its manager, and Merkin.  But this thin claim is inadequately pled.  The Amended Complaint does not specifically allege any such oral agreement; at best, paragraph 110 alleges that Merkin made an oral promise upon which KM relied, but the Amended Complaint does not anywhere allege an exchange of promises or other consideration, nor does it allege the date on which the contract was entered.  *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009) ("To show that an enforceable contract existed, the claimant must plead facts surrounding the formation of the contract such as the date the parties entered into the contract, the major terms of the contract, the

---

[2] Questioned on this point at argument, KM's counsel stated that he had became aware of the supposed oral contract after this Court's decision in *Matana I*, because he had not, prior to that point, taken the trouble to ask his client about that subject.

parties to the contract, and that the party to be bound assented to the contract."); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) ("a claim that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal") (citations omitted).

Indeed, the first time KM explicitly referred to a supposed oral contract was in its memorandum of law opposing the motion to dismiss the Amended Complaint. *See* KM Br. 17. Notably, in reciting the oral agreement's ostensible terms in that memorandum of law, *id.*, KM revealingly cites to paragraph 35 of the Amended Complaint. That paragraph discusses only written representations.

In any event, any such oral agreement would be precluded as a matter of law. That is because, in investing in Ascot Fund, KM disclaimed any reliance on representations outside "the Fund Documents and independent investigations made by the Investor." Princ Decl. Ex. 1 (Ascot Fund Limited Subscription Agreement), at 2. *See Cobalt Partners, L.P. v. GSC Capital Corp.*, 944 N.Y.S.2d 30, 35 (1st Dep't 2012) ("The subscription agreement states that in making the decision to purchase the Common Stock, plaintiffs relied solely on the information set forth in the Offering Memorandum and any other information obtained by plaintiffs directly from the Fund. Accordingly, plaintiffs expressly disclaimed reliance on any representations other than those they received from the Fund alone and cannot now complain that Group made them some sort of independent promise.") (citations omitted).

Furthermore, any such purported oral agreement would likely fail under the Statute of Frauds. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 106 (2d Cir. 2009) (holding, in a due diligence suit against an investment advisor for recommending that his advisees invest in what turned out to be a Ponzi scheme, that "under New York law, an oral

agreement that is not by its terms to be fully performed within one year falls within the Statute of Frauds if the option to terminate rests with the plaintiff alone"); *Zaitsev v. Salomon Bros.*, 60 F.3d 1001, 1003 (2d Cir. 1995) ("if performance within one year depends upon an act solely within the control of the party seeking to enforce the oral agreement, the Statute of Frauds remains applicable").

Defendants' motion to dismiss KM's claim of a breach of a contractually implied duty of good faith and fair dealing is, therefore, granted.

**B. Fraud**

KM's Amended Complaint alleges that defendants made fraudulent representations, or omitted required disclosures, that fraudulently induced KM to maintain its investment in Ascot Fund.  In their motion to dismiss, defendants argue that, as a categorical matter, New York fraud law no longer recognizes such "holder claims."  Alternatively, defendants argue, even if some form of holder claims are cognizable in New York, the Amended Complaint does not adequately allege any materially false statements or omissions or otherwise fails to state a claim.  For the reasons that follow, the Court agrees with KM that New York law appears still to recognize a limited class of holder claims of fraud, but holds, with defendants, that the Amended Complaint does not state a claim for common-law fraud.

**1.  The Status of Holder Claims Under New York Law**

In *Matana I*, the Court canvassed the evolution of the New York common law of fraud as applied to holder claims, including the decision of the Appellate Division, First Department, in *Starr Foundation v. American International Group., Inc.*, 901 N.Y.S.2d 246 (1st Dep't 2010), which held that holder claims are not available to the extent the plaintiff holder seeks to recover lost profits, as opposed to recoup losses.  *See Matana I*, 2013 WL 3940825, at *11.  But, as the

10

Court in *Matana I* noted, the New York courts have not clearly resolved the status of holder claims under New York law.  Where, as here, "the law of New York on this issue is not yet authoritatively articulated, this Court must carefully 'predict' how the highest court of New York would resolve the uncertainty."  *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005) (quoting *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 199 (2d Cir. 2003)).

The Court's analysis begins with the elements of common-law fraud.  "Proof of fraud under New York law requires a showing that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Matana I*, 2013 WL 3940825, at *12 (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006)).  Those elements do not, by their terms, exclude claims of fraud by persons alleging that they were fraudulently induced to retain securities or other holdings.  The cause of action for fraud in New York thus differs from the cause of action for securities fraud under federal law, the elements of which are found in Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, which in turn implements § 10-b of the Securities Exchange Act of 1934.  Under federal law, the fraudulent misrepresentation or omission must have been "in connection with" a "purchase or sale," 17 C.F.R. § 240.10b-5, language which the Supreme Court has held does not permit claims of fraud brought by mere holders.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).

Recently, in *Starr*, as noted, the First Department held that holder claims cannot proceed to the extent they seek lost profits.  901 N.Y.S.2d 246.  "A federal court will only decline to follow such an intermediate appellate court decision if it 'find[s] persuasive evidence that the

11

New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion,'" *AHW Inv. P'ship v. Citigroup Inc.*, No. 09 MD 2070 (SHS), 2013 WL 5827643, at *7 (S.D.N.Y. Oct. 30, 2013) (quoting *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011)).  There is no persuasive evidence that the New York Court of Appeals would depart from the thoughtful reasoning in *Starr*.  The question, here, however, is not *Starr's* validity, but its reach, *i.e.*, whether *Starr* reveals that the New York courts would also refuse to recognize holder claims seeking to recoup losses.  That question is central here, because KM's claim, at least in substantial measure, seeks to recover the value of its investment in Ascot Fund that disappeared upon revelation of the Madoff fraud.

As to that question, a close analysis of *Starr* is instructive.  The plaintiff there was a charitable foundation, The Starr Foundation ("the Foundation"), whose original endowment was comprised entirely of stock in American International Group, Inc. (AIG), a publicly traded company.  901 N.Y.S.2d at 248.  The Foundation alleged that, in 2007, it determined to sell off most of its AIG stock, but as a result of fraudulent statements by AIG, which minimized the degree of risk attached to AIG's credit default swap portfolio, the Foundation set a higher floor price for such sales ($65 per share) than it would have absent AIG's unduly rosy statements.  *Id.* As a result, the Foundation ceased selling its shares when AIG's share price fell below $65, leaving it holding approximately 15.5 million AIG shares when AIG later reported billions of dollars in credit default swap losses and its stock plummeted.  *Id.*  The Foundation then sued AIG "to recover the value it hypothetically would have realized for its 15.5 million shares of AIG stock in the late summer or fall of 2007 had defendants at that time accurately disclosed the risk of AIG's CDS portfolio, less the stock's value after the alleged fraud ceased to be operative in early 2008."  *Id.*  Inasmuch as the Foundation's "original cost basis was just over 7.4 cents per

share," *id.* at 253 (Moskowitz, J., dissenting), almost all of the value that the Foundation sought to recoup in its lawsuit would have represented profit.

   *Starr* dismissed the Foundation's holder lawsuit "for three distinct but related reasons." *AHW*, 2013 WL 5827643, at *6. First, under New York's "longstanding" out-of-pocket rule, damages for fraud "'are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained,' and 'there can be no recovery of profits which would have been realized in the absence of fraud.'" *Starr*, 901 N.Y.S.2d at 249 (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421(1996)). Second, "the value to the claimant of a hypothetical lost bargain is too undeterminable and speculative to constitute a cognizable basis for damages." *Id.* at 250 (citation omitted). Third, in the case at hand, the decline in AIG's stock value had not been caused by AIG's alleged misrepresentations, but by its underlying business decisions which the stock market only belatedly came to appreciate, and these "paper losses" would have ensued regardless of when AIG's exposure to credit default swaps came to light. *Id.* at 249–250. In other words, had AIG been forthright about its exposure from the start, its stock price would have declined sooner, and the Foundation would not have been in any better position than the one in which it ultimately found itself.

   Defendants read *Starr* as barring all holder claims, not just those for lost profits. But *Starr* cannot be read so broadly. The First Department in *Starr* contrasted the facts before it from those in *Continental Insurance Co. v. Mercadante*, 225 N.Y.S. 488 (1st Dep't 1927). There, a holder's fraud claim was sustained where the plaintiffs "alleged that as a result of being fraudulently induced to refrain from selling their bonds, they were ultimately left with instruments that were substantially worthless," and thus "did suffer an out-of-pocket loss,

13

specifically, the loss of their investment in the bonds." *Starr*, 901 N.Y.S.2d at 252 (citing *Mercadante*). *Starr* "[a]ssum[ed] the continued vitality of *Mercadante*," and indicated that, as in *Mercadante*, a plaintiff who brought a holder claim to recoup "the loss of [an] investment" could potentially obtain relief. *Id.* In such a situation, the concern that the First Department articulated in *Starr* about compliance with the out-of-pocket limitation would be respected. And the court's second concern, that plaintiffs not seek speculative damages, would be significantly alleviated because recovery would be capped at the plaintiff's original investment. To be sure, the First Department's final concern—that it will a dissatisfied holder's after-the-fact claim that it would have sold its holdings but for a disclosure or non-disclosure will often be conjectural—exists whether the holder claims out-of-pocket damages or lost profits. But the *Starr* court did not state that that consideration was dispositive in its analysis. Instead, it was merely an additional reason not to allow holder claims for lost profits. And, in some circumstances, as courts have recognized, including in connection with Madoff-related lawsuits, a claim by a holder to recoup the out-of-pocket cost basis of an investment vaporized by an undisclosed fraud may present more reliable means of proving causation. *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 445 (2010) (distinguishing *Starr* on the grounds that "[t]he loss at issue in this litigation—the fall-out from Madoff's Ponzi scheme—cannot be easily compared to the facts present in a more typical securities fraud action"); *cf. AHW*, 2013 WL 5827643, at *7 n.7 (distinguishing *Starr*, which "addressed the specific issue of the viability of claims by holders of publicly traded securities," from cases in which "the New York Court of Appeals has recognized that common law fraud claims extend to plaintiffs who were fraudulently induced to refrain from acting"); *Prime Mover Capital Partners, L.P. v. Elixir Gaming Technologies, Inc.*, 793 F. Supp. 2d 651, 672 n.108 (S.D.N.Y. 2011) (Kaplan, J.) (holding, after *Starr*, that "[u]nlike federal

securities law, New York common law in certain circumstances allows a plaintiff to recover on a fraud claim where the plaintiff was injured because he or she held, rather than bought or sold, securities in reliance on defendants' misrepresentations. . . . Plaintiffs, however, have neither argued nor pleaded such a 'holder' claim.").

In light of *Starr*'s explicit distinction between lost profits and out-of-pocket losses, at argument, defendants conceded that *Starr* does not, by itself, bar all holder claims.  Defendants instead argued that a later decision, *Tradex Global Master Fund SPC LTD v. Titan Capital Group III, LP*, 944 N.Y.S.2d 527 (1st Dep't 2012), extended *Starr* to bar *all* holder claims.  The Court does not so read *Tradex*.  *Tradex* instead is faithful to *Starr's* distinction between lost profits and out-of-pocket losses:  "[U]nder New York law, such a 'holder claim' would be precluded under the out-of-pocket rule by which the true measure of damages for fraud is indemnity for the actual pecuniary loss sustained as a direct result of the wrong.  Under the rule there can be no recovery of profits which would have been realized in the absence of fraud."  *Id.* at 529 (citing *Starr*).

Defendants also rely on *Irvin v. Jones*, 966 N.Y.S.2d 346, 2012 WL 6634476 (Sup Ct. Suffolk Cnty. Dec. 13, 2012).  There, plaintiff Barbara Irvin alleged that, after her husband died, the defendant accountants, who "controlled every aspect of [her] finances," used her money to benefit themselves, including through a self-dealing investment in an office building in Cincinnati, Ohio.  *Id.* at *1.  Irvin sued these accountants for out-of-pocket losses and lost investment opportunities.  *Id.* at *2.  The Supreme Court, Suffolk County, dismissed Irvin's New York fraud claim "to the extent that such cause of action may be read as asserting 'holder' claims, *i.e.*, that the plaintiffs' were wrongfully induced by the defendants to hold rather than sell the [Cincinnati office building] and other investments, [because] such claims are not actionable

under New York law." *Id.* at *11. Defendants read this as a categorical bar on holder claims. Merkin Br. 14; Merkin Reply Br. 10–11. But *Irvin* does not squarely so hold. First, it is not clear whether the court's phrase "such claims are not actionable" referred to holder claims in general, or just those at issue in that case. The court's one-sentence explanation for dismissing the holder claim, focused entirely on the out-of-pocket rule, suggests the latter interpretation. *Id.* at *11 ("The 'out-of-pocket rule' limits the recovery of damages for fraud to the actual pecuniary loss sustained as a direct result of the wrong and precludes recovery of profits which might have been realized but for the wrongful conduct.") (citing *Starr* and *Tradex*). Second, the court's treatment of the issue is too cursory to merit deference as to the path of New York fraud law. Third, *Irvin* was decided by a state trial court. The "proper regard" this Court owes it is less than that due to rulings by a higher court. *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 199 (2d Cir. 2003) (in predicting state law, "we must give 'fullest weight' to the decisions of a state's highest court, and we must give 'proper regard' to the decisions of a state's lower courts") (quoting *Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir. 1994)); *AHW*, 2013 WL 5827643, at *7 ("A federal court will only decline to follow such an intermediate appellate court decision if it 'find[s] persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion'") (quoting *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011)).

On the present state of the case law, therefore, this Court cannot predict that the New York Court of Appeals would preclude holder claims altogether. No New York state court has so held, or even so stated in dicta. The Court instead is compelled to predict, consistent with *Starr*, that the New York Court Appeals today would still recognize a limited set of holder claims, specifically, those in which plaintiffs seek to recover out-of-pocket losses, and perhaps,

but not necessarily, further limited to those in which there is a non-conjectural evidentiary basis

for asserting causation and tabulating damages.  The Court, accordingly, rejects defendants'

argument that KM's fraud claims are non-cognizable on the ground that the New York Court of

Appeals would not recognize any holder claim.

### 2.   KM Has Not Adequately Alleged Fraud

The Court turns, next, to defendants' alternative argument for dismissal—that the claims

of fraud in the Amended Complaint do not state a claim under Rule 12(b)(6).  "Proof of fraud

under New York law requires a showing that (1) the defendant made a material false

representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff

reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of

such reliance.'"  *Matana I*, 2013 WL 3940825, at *12 (quoting *Wall*, 471 F.3d at 415–16).  As

noted, the Amended Complaint alleges that defendants made three sets of statements that

fraudulently caused KM to maintain its investment in Ascot Fund.  The Court considers these in

turn.

### a.   *Ascot Fund's Financial Statements*

The Amended Complaint alleges that KM retained its investment in Ascot Fund based on

a series of false statements in Ascot Fund's financial statements for fiscal years 2006 and 2007,

which were delivered to KM in April 2007 and April 2008, respectively.  Am. Compl. ¶¶ 6, 64.

First, the financial statements represented that Merkin earned "investment advisory fees" of $26

million in 2006 and $28 million in 2008.  *Id.* ¶¶ 6, 67.  In fact, the Amended Complaint alleges,

that representation was false because Merkin did not provide investment advisory services to

Ascot Fund, but instead funneled the money to Madoff.  *Id.* ¶ 67.  Second, the statements

represented that Ascot Partners "has a prime brokerage agreement along with clearing

agreements with brokerage firms to carry its account as a customer," *id.* ¶¶ 6, 68; in fact, the Amended Complaint alleges, Madoff did not function as prime broker, *id.* ¶ 69.  Third, the statements represented that Ascot Partners' "brokers have custody of the Partnership's securities." *Id.* ¶ 70.  The Amended Complaint alleges that this was false, because there were not "brokers," but only one broker, Madoff, who had custody of substantially all of Ascot Partners' assets. *Id.*

The Amended Complaint does not state facts upon which a factfinder could plausibly infer that KM relied upon any of these statements in its decision to hold, rather than seek to redeem, its investment in the Ascot Fund.  Reasonable "[r]eliance provides the requisite causal connection between the defendant's misrepresentation and the plaintiff's injury." *Ackerman v. Price Waterhouse*, 683 N.Y.S.2d 179, 191 (1st Dep't 1998)).  This is not a "fraud-on-the-market" case in which reliance is presumed.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  To survive a motion to dismiss, the Amended Complaint must instead plausibly plead that defendants' specific representations caused its injury, *i.e.*, its decision to maintain its investment, such that had those representations not been made, KM would have redeemed its investment in Ascot Fund.

The Amended Complaint fails to do so.  It offers only a conclusory assertion that KM would have redeemed its Ascot Fund position absent these three statements.  But, this *ipse dixit* aside, the Amended Complaint does not plead facts that supply a plausible basis from which a factfinder could infer that, but for these representations, KM would have initiated a redemption.  The Amended Complaint does not, for example, allege that KM had in place a specific investment philosophy and standards, that the representations whose accuracy the Amended Complaint now challenges were necessary to cause KM to believe that the Ascot Fund met those

standards, and that financial statements that lacked these representations would have triggered a decision within KM to exit that Fund.  The Amended Complaint does not allege that there were meetings or discussions within KM as to whether to retain the Ascot Fund position, and that the challenged representations factored into KM's decision to continue to hold.  There are, in fact, no concrete allegations as to KM's investment history that would give a factfinder a non-speculative basis on which to conclude that, but for the challenged representations, KM would have abandoned the Ascot Fund.

Importantly, this not an instance in which plaintiffs can invoke the principle of *res ipsa loquitur, i.e.*, where the inherent nature of a fund's representations makes it obvious that, without such representations, a rational investor would have redeemed his stake.  Far from it:  It is  not plausible that KM would have redeemed its investment if defendants had reformulated, or omitted, these three technical, narrow statements.   The Amended Complaint presupposes that, had the Fund called the money paid to Merkin "fees" rather than "investment advisory fees," or dropped the reference to the Ascot Fund's "prime brokerage agreement along with clearing agreements with brokerage firms," or used the singular word "broker" rather than "brokers," it would have taken a U-turn so as to veer from the Ascot Fund.[3]  But the Amended Complaint pleads no facts to suggest that these subtleties would have been material to an investment holder, let alone that KM actually relied on them in deciding to retain its investments.  In sum, without more, the alternative history that the Amended Complaint conjures is not plausible.  In Rule

---

[3] Nor does the Amended Complaint allege concrete facts as to when KM would have sought to make such a redemption, how much of its investment it would have sought to redeem, and how much of that investment it would have reclaimed given that, as is known now, Madoff would have absconded with the Fund's money.  A factfinder would be forced to guess in hindsight at these questions—the very concern about unguided conjecture that troubled the *Starr* court.

12(b)(6) terms, the Amended Complaint fails to plausibly plead the element of reliance (and, relatedly, the element of materiality).

> b. *Gabriel's Quarterly Letters*

KM next alleges that it retained its investments in Ascot Fund as a result of a series Quarterly Letters that another Merkin fund, Gabriel, sent to its investors, including KM's Jesselson. *Id.* ¶¶ 7, 72–86.

Before delving into the specifics, the Court notes that these alleged representations were not made to KM and did not concern Ascot Fund, or even Ascot Partners, in which Ascot Fund had invested. The Court previously noted this problem in dismissing the original complaint. *Matana I*, 2013 WL 3940825, at *12 n.9. ("At argument, defense counsel represented that the letters referenced [which were not attached as exhibits] were sent to investors in Gabriel Fund, not Ascot Fund. Tr. 47. In the event of an Amended Complaint citing these letters, the Court expects that KM would attach these letters and would amplify its theories of materiality and reliance."). But the Amended Complaint does not explain any better than its predecessor how letters that were not sent to KM and did not address the fund in which KM had invested are ones on which KM could have reasonably relied in deciding to maintain its investment in Ascot Fund. For this reason alone, the Amended Complaint, to the extent based on the Gabriel Quarterly Letters, does not state a claim for common-law fraud.

Even if KM could have reasonably relied on the Gabriel Quarterly Letters, the Amended Complaint does not adequately allege statements in them that were actionable in fraud. First, the Amended Complaint alleges that the letters were materially misleading because certain letters (sent outside of the statute of limitations) stated that many of the fund's investment opportunities had come through Steve Feinberg and his Cerberus Group, Am. Compl. Ex. G at 3 (April 20,

2005), Ex. H at 5 (October 20, 2005), and Ex. I at 3 (July 20, 2006), and subsequent letters (sent within the statute of limitations) emphasized Gabriel's "sourcing advantage," *id.* Ex. J at 7 (January 20, 2007), "sourcing network," *id.* Ex. K at 8 (July 20, 2007), and "sourcing networks," *id.* Ex. L at 8 (January 20, 2008), whereas none of the letters disclosed to Gabriel's investors that Gabriel had invested in Madoff.  *Id.* ¶ 76–77.  But the letters never purported to identify all of Gabriel's sources, so the non-identification of one source, Madoff, was not inherently misleading.  Nor does the Amended Complaint allege that these statements were false; after all, Gabriel invested 20 to 30 percent of its assets with Madoff, and there is no specific pleading that it lacked the sourcing network the letters describe.  *Id.* ¶ 7.  Finally, the letters' vague statements about Gabriel's "sourcing advantage" are classic puffery.  They are "optimistic generalizations . . . 'too general to cause a reasonable investor to rely upon them.'"  *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ.11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

The Amended Complaint next alleges that the Quarterly Letters were materially false and misleading because, "despite repeatedly emphasizing the centrality of diversification," they did not "reveal[] or even suggest[] the material role played by Madoff in *all* four (4) Merkin funds," such that investing in multiple Merkin funds increased exposure to Madoff.  *Id.* ¶ 78 (emphases in original).  But even if that statement to Gabriel's investors was a potential basis for claiming fraud directed at KM, and even if it could be viewed as non-puffery, that statement as alleged was not misleading as applied to *Gabriel*, which was the subject of the letters.  Gabriel invested only 20 to 30 percent of its funds with Madoff, *id.* ¶ 7, and, as KM acknowledged at argument on the first motion to dismiss, Merkin did not actually know that Madoff was engaged in a Ponzi

scheme, 7/8/2013 Tr. at 39–40.  KM argues that the statement to Gabriel's investors was misleading because other funds that Merkin advised also invested in Madoff.  Thus, KM argues, based on the non-identification of Madoff, investors in those other funds might unwittingly increase their exposure to Madoff by investing in Gabriel and those other funds.  But this argument, too, does not withstand analysis.  The letters were addressed solely to investors in Gabriel; they do not purport to address the circumstance in which an investor invested in both Gabriel and other Madoff-invested funds; and there is no allegation that KM invested in Gabriel and thus could stand to be harmed by the negative synergy of investing in both Gabriel and the Ascot Fund.

Finally, the Amended Complaint alleges that these Quarterly Letters "created and reinforced the impression that Merkin was a true portfolio manager, entitled to be paid as one, when all he was [sic] a financial intermediary." *Id.* ¶ 86.  But, as to Gabriel, which unlike Ascot Fund did not invest most of its funds with Madoff, the Amended Complaint does not explain why it was false for Merkin to suggest that he "was a true portfolio manager" rather than a mere "financial intermediary."

As to other statements to Gabriel investors which the Amended Complaint quotes, in an April 20, 2007 letter, Merkin assured investors that Gabriel is "always playing defense, defense, defense, till the moment comes to shift direction and head up the ice." *Id.* Ex. M at 7; *see also id.* ¶ 82.  In a January 20, 2008 letter, Merkin characterized Gabriel's work as "combin[ing] some feel for the markets with research, hard work, and pounding the pavement" and explained that "[t]he combination of some talent and a lot of diligence got us through a rocky 2007, and we hope to employ the same formula to good if not better effect in calmer years ahead." *Id.* Ex. L at 9; *see also id.* ¶ 83.  And in a July 21, 2008 quarterly letter, Merkin assured investors that "we

22

remain focused on preserving principal and committed to managing risk." *Id.* Ex. N at 7; *see also id.* ¶ 84.

These statements are not actionable in fraud.  The Court in fact previously rejected as non-actionable allegations based on three of these statements, *Matana I*, 2013 WL 3940825, at *12, and the new one, regarding Gabriel's "feel for the markets," is no less puffery.  *See ECA*, 553 F.3d at 205–06 (statements that "risk management processes . . . are highly disciplined and designed to preserve the integrity of the risk management process" were "merely generalizations regarding [defendant's] business practices" and inactionable puffery); *cf. City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2013 WL 1174017, at *16 (S.D.N.Y. Mar. 22, 2013) ("generalized statements touting the quality of a company's risk management process are puffery").

### c.  *Omissions Regarding Madoff*

Finally, the Amended Complaint alleges that material omissions led KM to retain its investments in Ascot Fund.  Specifically, it alleges, Merkin had a fiduciary duty to KM, which he breached by his non-disclosure of "disquieting facts" that, in 2007 and 2008, he learned or should have learned about Madoff.  Am. Compl. ¶¶ 87–98.  These were that:  (1) Madoff had filed false and misleading Forms ADV with the SEC in 2006 to 2008, *id.* ¶¶ 90–91; (2) Madoff conducted a substantial portion of his options activity on a registered, not regulated, market, contrary to Merkin's representation in the Ascot Fund offering materials that Ascot would conduct its options activity solely in a regulated market, *id.* ¶¶ 92–94; (3) Madoff was not, contrary to his representations to Merkin, conducting a nontrivial percentage of Ascot Fund's options business over the Chicago Board Options Exchange (CBOE), as revealed by the fact that a high percentage of Ascot's options trades, on a money-weighted basis, occurred on days when

Ascot's trading alone represented more than 1000% of the CBOE volume for the contract traded, *id.* ¶ 95; (4) Madoff's claim that Ascot held accounts in its own name at the U.S. Treasury was untrue, *id.* ¶ 96; (5) Madoff first transmitted to Merkin supposed confirmations of $60 million in trades more than two weeks after the reported trade date, a suspicious practice that warranted investigation, *id.* ¶ 97; and (6) Madoff's transaction confirmations were otherwise incoherent and suspicious, and warranted investigation, *id.* ¶ 98.

These allegations fail to state a claim. To begin with, the Amended Complaint alleges that Merkin actually knew only one of these facts: that Madoff conducted a substantial portion of his options activity over-the-counter (OTC), not on a regulated market. *Id.* ¶¶ 92–94. As to the other five alleged omissions, the Amended Complaint alleges only that Merkin should have been aware of these facts. *See* Merkin. Br. 21–22. But a pleading that a defendant should have known certain facts does not allege scienter, because under New York law, a fraud claim requires that the "defendant knew [his misrepresentation or omission] to be false." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (also holding that "conclusory allegations" of knowledge are insufficient to state a claim for fraud).

The remaining allegation, to the effect that Merkin knew that Madoff's reported trades involved a much higher volume of OTC options activity than he had represented to Merkin, also fails for deficient pleading of scienter. The Amended Complaint does not plead, in other than a conclusory way, that Merkin's failure to disclose this fact to investors was done with fraudulent intent. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (plaintiffs must allege facts that "give rise to a strong inference of fraudulent intent"). The Amended Complaint does not articulate any coherent reason for Merkin to deliberately hide this information from investors. Tellingly, counsel for KM has conceded that Merkin at no point prior to the revelation

of Madoff's Ponzi scheme was aware that Madoff was engaged in a fraud.  7/8/2013 Tr. at 39–

40.  Had Merkin been alleged to know of Madoff's fraud, a deliberate attempt by him to hide that

fraud from his investors would presumably give rise to a plausible claim of fraud.  But, absent

such knowledge, Merkin's nondisclosure to investors of this particular deviation from Madoff's

promised investment course does not, without more, bespeak fraudulent intent.

To be sure, such omissions might have been actionable if brought under a different cause

of action.  But, as noted, KM's inexplicable decision to defer filing its original Complaint until

2013 meant that such claims, *e.g.*, for gross negligence, fell outside the statute of limitations.  *See*

*Matana I*, 2013 WL 3940825, at *14.  On the timely claim that remains, for a fraud aimed at

holders, these omissions fall short of stating a claim.  *See In re Merkin*, 817 F. Supp. 2d 346, 357

(S.D.N.Y. 2011) (in a federal securities fraud suit against Merkin, holding that "allegations of

Madoff-related red flags do not adequately plead scienter"); *In re Beacon Associates Litig.*, 745

F. Supp. 2d 386, 414 (S.D.N.Y. 2010) (in a federal securities fraud case, holding that "Plaintiffs'

red flag theory is essentially that rejected by the Court of Appeals for the Second Circuit in *South*

*Cherry*: had BAMC investigated Madoff, it would have uncovered that he was a fraud."); *SSR II,*

*LLC v. John Hancock Life Ins. Co. (U.S.A.)*, 964 N.Y.S.2d 63, 2012 WL 4513354, at *6 (Sup.

Ct. N.Y. Cnty. 2012) ("[I]n almost every case . . . courts have not held investment advisors liable

for failing to deduce that Madoff was running a Ponzi scheme."); *cf. Sapirstein-Stone-Weiss*

*Found. v. Merkin*, No. 13 Civ. 415 (VM), 2013 WL 2495141, at *5 (S.D.N.Y. June 11, 2013)

("Plaintiffs do not merely allege that Defendants failed to heed various 'red flags,' an allegation

that standing alone might be insufficient to plead scienter.").[4]

---

[4] Because the Court dismisses these allegations for failure to adequately plead scienter, it has no
occasion to reach defendants' alternative challenge to KM's omission-based theory of fraud:
that defendants did not have a fiduciary duty to KM, and therefore under New York law, there

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is granted. The Clerk of Court is directed to terminate the motion pending at docket number 52, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: November 22, 2013
      New York, New York

---

can be no liability for omissions because "an omission does not constitute fraud unless there is a fiduciary relationship between the parties." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 849 N.Y.S.2d 510, 512 (1st Dep't 2007) *aff'd*, 12 N.Y.3d 553 (2009).